DUPLEX PRINTING PRESS COMPANY *v.* DEER-ING ET AL., INDIVIDUALLY AND AS BUSINESS AGENTS OF DISTRICT NO. 15 OF THE INTER-NATIONAL ASSOCIATION OF MACHINISTS, ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 45. Argued January 22, 1920.—Decided January 3, 1921.

1. The Act of October 15, 1914, known as the Clayton Act, in so far as it grants relief by injunction to private suitors, or affixes conditions and otherwise modifies the Sherman Act, is applicable to a suit for an injunction pending at the time of its enactment. P. 464.

2. For the purpose of compelling a manufacturer of printing presses to unionize its factory in Michigan, in which there had been an unsuccessful strike, and to enforce there the "closed shop," the eight-hour day and the union scale of wages, organizations of machinists with headquarters at New York City, and a larger organization of national scope with which they were affiliated, entered into a combination to interfere with and restrain the manufacturer's interstate trade by means of a "secondary" boycott, centered particularly at New York City and vicinity where many of the presses were marketed; in pursuance of which this manufacturer's customers in and near New York were warned, with threats of loss and of sympathetic strikes in other trades, not to purchase or install its presses; a trucking company usually employed by customers

was notified, with threats, not to haul them; employees of the truck-
ing company and of customers were incited to strike in order to
prevent both hauling and installation; repair shops were notified
not to repair them; union men were coerced by threats of the loss
of their union cards and of being blacklisted as "scabs" if they
assisted in installing them; an exposition company was threatened
with a strike, if it allowed them to be exhibited, etc., etc.,—all of
which seriously interfered with the interstate trade of the manufac-
turer and caused great loss to its business. *Held*, a combination
and conspiracy to restrain interstate commerce against which the
manufacturer was entitled to relief by injunction under the Sherman
Act, as amended by the Clayton Act. Pp. 461 *et seq.*

3. A conspiracy is a combination of two or more by concerted action
to accomplish an unlawful purpose or to accomplish a purpose not
in itself unlawful by unlawful means. If the purpose be unlawful, it
may not be carried out by means otherwise lawful; and although
it be lawful, it may not be carried out by means that are unlawful.
P. 465.

4. A "secondary boycott" is a combination not merely to refrain
from dealing with the person aimed at, or to advise or by peaceful
means persuade his customers to refrain, but to exercise coercive
pressure upon such customers, actual or prospective, in order to
cause them to withhold or withdraw patronage through fear of loss.
or damage to themselves.  P. 466.

5. In determining the right to an injunction under the Clayton and
Sherman Acts, the legality or illegality of a boycott under the
common law or under the statutes of a particular State is of minor
consequence, since the acts of Congress are paramount in their field
and must be given full, independent effect.  P. 466.

6. It is settled by decisions of this court that a restraint of interstate
commerce produced by peaceable persuasion violates the Sherman
Act, and is not justified by the fact that the participants in the
combination or conspiracy have an object beneficial to themselves
or their associates which they might have been at liberty to pursue
in the absence of the statute.  P. 468.

7. Section 6 of the Clayton Act, in declaring that nothing in the anti-
trust laws shall be construed to forbid the existence and operation
of labor organizations or to forbid their members from lawfully
carrying out the legitimate objects thereof, and that such organi-
zations or their members shall not be construed to be illegal com-
binations or conspiracies in restraint of trade, assumes that the nor-
mal objects of such organizations are legitimate, but contains nothing

to exempt them or their members from accountability when they depart from objects that are normal and legitimate and engage in an actual combination or conspiracy in restraint of trade. It does not authorize any activity otherwise unlawful, or enable a normally lawful organization to cloak such an illegal combination or conspiracy. P. 468.

8. The first paragraph of § 20 of the Clayton Act—which provides that injunctions shall not be granted in any case between an employer and employees, etc., growing out of a dispute concerning the terms and conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and that such property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney,—is merely declaratory of the law as it stood before. P. 469.

9. The second paragraph of § 20 of the Clayton Act, which provides that "no such . . . injunction shall prohibit" certain specified acts, manifestly refers to injunctions in any case of the character mentioned in the paragraph preceding, namely, "a case between an employer and employees . . . involving, or growing out of, a dispute concerning terms or conditions of employment;" and the concluding words of the second paragraph, "nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States," are to be read in the light of the context, and mean only that those acts are not to be so held when committed by parties concerned in a "dispute concerning terms or conditions of employment." P. 469.

10. As the section imposes an exceptional and extraordinary restriction upon the equity powers of the federal courts, and upon the general operation of the anti-trust laws, conferring a special privilege or immunity upon a particular class to the detriment of the general public, the rules of statutory construction forbid that the privilege be enlarged by resorting to a loose construction or by ignoring or slighting the qualifying words of the section. P. 471.

11. This section confines the exceptional privilege to those who are proximately and substantially concerned in an actual dispute respecting the terms or conditions of their own employment, past, present or prospective; it does not use the words "employers and employees" in a general class sense, or treat all the members of a labor organization as parties to a dispute which proximately affects but a few of them. Pp. 471 *et seq.*

12. That the Clayton Act was not intended to legalize the secondary boycott is shown by its legislative history. P. 474.

·13. In construing an act of Congress, debates expressing views and motives of individual members may not be resorted to, but reports of committees and explanatory statements in the nature of a supplemental report made by the committee member in charge of the bill in course of passage, may. *Id.*

252 Fed. Rep. 722, reversed. ·

THE case is stated in the opinion.

*Mr. Walter Gordon Merritt* and *Mr. Daniel Davenport* for appellant:

This is not an ordinary labor case in which the defendants have sought to improve their conditions of employment by a strike and incidental picketing against their employer, to which the ordinary rules relative to labor unions are applicable. Such a case involves manufacturing and production, which are the peculiar concern of labor unions.

The attack here is upon complainant's trade and commerce, *United States* v. *Knight Co.,* 156 U. S. 1; *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373; and there is not, nor has there been, any strike or discontent among the complainant's employees, except the ordered quitting work on August 27, 1913, of eleven out of 200 in the factory at Battle Creek and three road men erecting presses in different parts of the country. The complainant's productive organization is intact, and there is a harmonious copartnership between it and its employees, producing goods which are being attacked by union men in the interest of union factories and their employees. If complainant's employees were dissatisfied and had withdrawn from their employment with the complainant, and there was nothing else in the case, it would be a strike case, but since outsiders are trying to attack the trade and commerce being carried on through a harmoni-

ous partnership of labor and capital it is a boycott case. When employer and employees are working happily together to such an extent that the workmen refuse all inducements to strike, any further interference with their rights, whether it be by violence, intimidation or a boycott of the fruits of their toil, is illegal. If strikers or labor union representatives cannot persuade men to quit work, their rights are exhausted and they cannot resort to additional and more drastic methods. A strike is a fight between labor and capital, where labor withdraws from its copartnership with capital, and such a withdrawal because of dissatisfaction with the terms of the partnership is lawful. But a boycott necessarily implies that the goods are being produced by an existing organization of labor and capital, so that any attack on the goods and the sale of those goods is an attack upon both labor and capital, by union men working in the interest of union employers—and sometimes at their instigation—to prevent the sale of the open-shop products and secure a monopoly for the union-made products; it is the open-shop employer and his employees on the one side and the union employer and union employees on the other side, and the legality of the combination is not to be tested by the rules applicable to a labor-capital fight where labor merely withdraws from its partnership with capital, but is to be tested by the anti-trust laws which define the lawful methods of competition in the sale and distribution of products.

One of the purposes of the anti-trust laws is to give the public the benefit of free competition, so that all products surviving the battle of fair competition may flow naturally into the public markets of the nation for the selection of consumers. Any artificial or unreasonable obstruction to trade which deprives the public of these advantages necessarily violates the anti-trust laws.

To unduly restrict competition or obstruct the course

of trade is injurious to the public because it deprives the public of its inherent right of enjoying the service and the fruits of the service of everybody, and because if the obstruction is successful it keeps goods from the market and restricts the public's right of choice in determining what articles it may purchase. Any combination which, by artificial means, seeks to obstruct the course of trade, is illegal, and only that obstruction is tolerated which is incidental to the ordinary and regular pursuit of a business. The combination in the case at bar and the injury which it has inflicted and threatens to inflict upon the complainant was not incidental to the pursuit of any legitimate business, but had for its sole and direct purpose the suppression of the complainant's competition by erecting an artificial barrier between complainant and its customers and destroying its interstate trade.

The object of the defendants is to prevent the sale and use of machines unless they come from factories operated and exclusively manned by members of the combination and in accordance with methods approved by it. According to the defendants' contentions, and the contentions of the union factories which have conceded their demands, they must protect the union factories from the competition of the open-shop factories, because, under the natural laws of trade and competition, the union factories cannot survive with their increased cost of production. Not being able to control the complainant's producing organization at Battle Creek because the employees are contented with their employment, the only possible method by which this could be accomplished is to restrain the trade and commerce of the complainant by making their products unsalable. This is done by calling strikes against their installation, preventing common carriers from hauling them, threatening purchasers with strikes of pressmen, and with the impossibility of operating the presses, causing breakdowns of such presses, preventing

their repair, and finally even seeking to suppress their public exhibition and advertisement. If this can be done the barrier between the complainant and the public market will be unsurmountable.

There is no relation between the complainant's factories in Battle Creek and the places where the presses are to be exhibited, hauled, installed or operated, except commerce, so that the only way in which the conditions in the factories can be affected by the conduct of the men at the place of consignment is by controlling commerce.

The combination violates the Federal Anti-Trust Law and the complainant is entitled to an injunction under the Act of October 15, 1914.

The right to work or quit work is no more absolute than any other constitutional right and ceases to be a right when exercised for the purpose of injuring another or accomplishing a result contrary to public policy or restraining trade contrary to law. *Aikens* v. *Wisconsin,* 195 U. S. 204; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459; *Loewe* v. *Lawlor,* 208 U. S. 274; 235 U. S. 522; *Montague* v. *Lowry,* 193 U. S. 38; *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600; *United States* v. *Patten,* 226 U. S. 525; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *State* v. *Duluth Board of Trade,* 107 Minnesota, 506.

A private party is entitled to an injunction against acts in violation of the Federal Anti-Trust Law. Clayton Act, § 16.

There is nothing in §§ 6 and 20 of the Clayton Act which legalizes conspiracies or forbids the issuance of injunctions in cases like this.

There is nothing in the act which indicates any intention to "draw the teeth" of the Anti-Trust Law, and everything points to a determination for more stringent

enforcement through supplementary legislation. The presence of § 6, as shown by the history of the legislation, is due to the fact that it was thought desirable to put at rest the contentions of some that the mere existence of labor unions for legitimate purposes was forbidden by the Sherman Anti-Trust Law.

Section 20 has no application to the case. It is obvious that none of the defendants is or has been or probably ever will be an employee of the complainant, whose factories are situated a thousand miles away from the State where the defendants reside. The limitation with which this section commences therefore excludes its application to the case at bar.

As a general proposition even workmen on strike are not "employees." *Atchison, Topeka & Santa Fe Ry. Co.* v. *Gee,* 139 Fed. Rep. 582; *Knudsen* v. *Benn,* 123 Fed. Rep. 636; *Union Pacific R. R. Co.* v. *Ruef,* 120 Fed. Rep. 102; *Iron Molders' Union* v. *Allis-Chalmers Co,* 166 Fed. Rep. 45 (Judge Grosscup's opinion).

It would seem that the word "employee" implies the existence of a continuing employment relation. *Louisville &c. R. R. Co.* v. *Wilson,* 138 U. S. 501. The various acts specified in § 20, as acts not to be enjoined, have some reasonable significance when considered as the acts of employees carried on incidentally with the calling of a strike, but are not acts which can be lawfully and properly carried on by outsiders. The defendants' contention and the decision of the Circuit Court of Appeals lead to the conclusion that a "dispute concerning conditions of employment" between the complainant and any one of its employees justifies all of the other so-called employees in the United States, including the 3,000,000 members of the American Federation of Labor, engaging in a conspiracy to prevent the sale of articles made by 99.9 per cent. of the contented employees of the complainant. If, as in this case, the union can create a necessary dispute

to legalize its attack by ordering 5 per cent of the workmen to quit, it may likewise open the flood gates of destruction against the joint products of the employer and his 99 per cent. contented employees by merely showing that 1 per cent. has responded to its orders. And it is, of course, obvious that § 20 refers to a dispute between the employers and employees and does not extend any immunity to outsiders or sympathizers. Certainly the word "employer" or "employee" or "dispute" should not be extended beyond its natural meaning when to do so will make it operate in derogation of common rights of the particular class of litigants specified.

The intent of § 20 was to forbid the issuance of injunctions in those cases, only, where the acts enumerated in its several clauses would not be "unlawful in the absence of such dispute," referring, of course, to a "dispute concerning terms or conditions of employment" between the several classes of persons enumerated in the first sentence of the section. Acts which were unlawful before the passage of the Clayton Act are still unlawful under it, because they are unlawful independently of and in the absence of a trade dispute.

In other words, in trade dispute cases the presence of a trade dispute shall not itself taint the specified acts with illegality if they are otherwise legal. Since the secondary boycott is still unlawful in the absence of a trade dispute, *Eastern States Retail Lumber Dealers' Association* v. *United States*, 234 U. S. 600, it must likewise be unlawful when connected with a trade dispute. This whole section of the law, as shown by its history, was only intended to put at rest the contentions of labor, fallacious though they were, that the courts discriminated unfairly against lawful acts in trade dispute cases. The secondary boycott therefore remains as unlawful as ever.

It is further obvious that the various acts mentioned

in § 20 against which injunctions shall not issue in this
limited class of cases are most of them acts which in and
of themselves are ordinarily lawful as between an em-
ployer and his employees, and that this section accom-
plishes no other purpose than to declare the previously
existing law on this subject. It merely declares that the
acts specified of themselves and by themselves shall not
be held to violate any federal law, but it does not mean
that jurisprudence shall be revolutionized by declaring
that such acts may be done with impunity to accomplish
criminal purposes. If, as stated by this court, not even
the recognition of a right by the Constitution can justify
its exercise in furtherance of a criminal plot (*Aikens* v.
*Wisconsin*, 195 U. S. 194), and the constitutional privi-
lege of free speech cannot be used as a defense to an injunc-
tion which restrains speech or writing, in furtherance
of an illegal conspiracy (*Gompers* v. *Bucks Stove & Range
Co.*, 221 U. S. 439), then it certainly follows that the
recognition of a right by a statute such as the Clayton Act
will not justify the exercise of that right in furtherance of
a criminal conspiracy, which is expressly recognized by
the same statute. When these acts are used in further-
ance of a criminal plot they become acts of an entirely
different character from those described by this section,
for they are colored, and their character determined, by
the illegal plot.

Defendants' contention, besides requiring a repeal by
implication, renders § 20 unconstitutional as class legis-
lation, especially as it would exempt laborers, not as
such but in their attempts to control sale and distribu-
tion of commodities. *Cleland* v. *Anderson*, 66 Nebraska,
252; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540.

From these well-reasoned decisions it would seem to
follow that an exemption from the anti-trust laws ex-
tended to any class of people, purely as a class, is un-
constitutional, if the exemption extends to that class

under the identical circumstances where other classes are bound by the law.

A statute forbidding the federal courts to issue any restraining order or injunction to prohibit the doing of enumerated acts, however unlawful they may be, and however necessary such order or injunction may be to preserve the subject-matter of the litigation, would conflict with the statutes creating those courts and with the general law giving them equitable jurisdiction over such cases when the matter involved exceeds $5,000 in amount.

Such a law would violate not only the due process clause of the Constitution, but that other clause which declares that the judicial power of federal courts of equity shall extend to all cases and controversies over which, by the statutes of their creation, they are given jurisdiction.

The right to injunction under the Clayton Act is established by *Paine Lumber Co.* v. *Neal*, 244 U. S. 459; and *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229. The act applies to a suit pending. *Pennsylvania* v. *Wheeling Bridge Co.*, 18 How. 421, 431; *Montgomery* v. *Pacific Ry. Co.*, 258 Fed. Rep. 382. And our construction of the act is sustained by *United States* v. *Rintelen*, 233 Fed. Rep. 793, 799; *Lamar* v. *United States*, 260 Fed. Rep. 561; *Alaska S. S. Co.* v. *International Longshoremen's Assn*, 236 Fed. Rep. 964; *Tri-City Central Trades Council* v. *American Steel Foundries*, 238 Fed. Rep. 728; *United States* v. *King*, 250 Fed. Rep. 908; 229 Fed. Rep. 275; *Stephens* v. *Ohio State Telephone Co.*, 240 Fed. Rep. 759; *Dowd* v. *United Mine Workers*, 235 Fed. Rep. 1; *United Mine Workers* v. *Coronado Co.*, 258 Fed. Rep. 829; and it is confirmed by its legislative history.

The combination is unlawful at common law. [Citing numerous decisions, including: *Shine* v. *Fox Bros. Mfg. Co.*, 156 Fed. Rep. 357; *Auburn Draying Co.* v. *Wardell*, 227 N. Y. 1; *Irving* v. *Joint District Council*, 180 Fed.

Rep. 896; *Huttig Sash & Door Co.* v. *Fuelle*, 143 Fed. Rep. 363; *Purvis* v. *United Brotherhood*, 214 Pa. St. 348; *Purington* v. *Hinchliff*, 219 Illinois, 159; *Lohse Patent Door Co.* v. *Fuelle*, 215 Missouri, 421; *Moores* v. *Bricklayers* (Ohio), 23 Law Bull. 665; *Thomas* v. *Cincinnati &c. Ry. Co.*, 62 Fed. Rep. 818; *Toledo, A. A. & N. M. Ry. Co.* v. *Pennsylvania Co.*, 54 Fed. Rep. 730; *Thomson Machine Co.* v. *Brown*, 89 N. J. Eq. 326; *Employing Printers Club* v. *Blosser Co.*, 122 Georgia, 509; *Seubert* v. *Reiff*, 98 Misc. 402; 164 N. Y. S. 522; *Schlang* v. *Ladies' Waist Makers' Union*, 124 N. Y. S. 289; 67 Misc. 221; *Burnham* v. *Dowd*, 217 Massachusetts, 351; *Loewe* v. *Lawlor*, 208 U. S. 274, 288; *Martell* v. *White*, 185 Massachusetts, 255].

The question of the applicability of the common law is for the independent decision of the federal courts, not controlled by the decisions of the New York courts. *Baltimore & Ohio R. R. Co.* v. *Baugh*, 149 U. S. 368; *Burgess* v. *Seligman*, 107 U. S. 33; *Smith* v. *Alabama*, 124 U. S. 465; *Rocky Mountain Telephone Co.* v. *Montana Federation of Labor*, 156 Fed. Rep. 809; *Loewe* v. *California State Federation of Labor*, 139 Fed. Rep. 71.

*Mr. Frank X. Sullivan*, with whom *Mr. Frank L. Mulholland* was on the brief, for appellees:

The means employed by the defendants to secure an eight-hour day and minimum rate of wage throughout the trade are authorized by the Clayton Amendment. Prior to this amendment the factor of "economic sympathies" referred to in *Gill Engraving Co.* v. *Doerr*, 214 Fed. Rep. 111, 120, note, placed the legality of the acts of labor unions in such doubt that it was not possible safely to direct the action of a combination of working men during a period of industrial dispute. Now this amendment clearly states what may be done; and whether it amplifies or merely clarifies what was the law, is im-

material.   When the amendment was before Congress, it was recognized that the purpose was to change or clarify the law as laid down by the Supreme Court in the *Danbury Hatters' Case, Loewe v. Lawlor*, 208 U. S. 274; 235 U. S. 522; *Eastern States Retail Lumber Dealers' Association* v. *United States*, 234 U. S. 600; 51 Cong. Rec., p. 15945. .It affirmatively appears that it was the decision in the *Danbury Hatters' Case* that brought the amendment about, and the great publicity of that case created the sentiment in its favor.   There had been earlier attempts in Congress to exempt organizations of farmers and laborers from the Anti-Trust Law. *Loewe v. Lawlor,* 208 U. S. at p. 301; *Lawlor* v. *Loewe*, 209 Fed. Rep. 721, 726.

. The collection of the judgment in the *Danbury Hatters' Case* (235 U. S. 522), by sale on execution of the workingmen's homes, could not be shifted from the shoulders of those directly bearing the burden to the public at large. It was a calamity for them, and the purpose of the Clayton Amendment was in part to prevent the recurrence of just such a catastrophe.

The effort of labor organizations to secure an equalization of the hours of labor and rate of wages throughout a trade is not only lawful but extremely beneficial both to employers and employees, and in accomplishing this purpose they are regarded with favor and approval by the courts of the community.   *Wilson v. New*, 243 U. S. 332; *Paine Lumber Co.* v. *Neal*, 244 U. S. 459, 471; *Bossert* v. *Dhuy*, 221 N. Y. 342.   It is perfectly clear that the object sought by the defendants was legitimate and laudable, and as such affords no ground for charging them with a conspiracy.. Distinguishing: *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229; *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373; *United States* v. *Rintelen*, 233 Fed. Rep. 793, 799; *Auburn Draying Co.* v. *Wardell*, 227 N. Y. 1.   This case falls directly within § 20 of the

Clayton Act, and is not analogous to the *Paine Lumber
Company Case*, because here there was a strike or dispute
over wages and hours between employer and employee.

The position of defendants has been that they will do
all of appellant's work or none of it; that they refuse to
handle and erect appellant's presses unless they can
manufacture them. The appellant's contention is that
it desires to employ men ten hours a day without any
basic minimum wage, and to employ members of the
International Association when it desires them to erect
its presses when sent out from Battle Creek; and the
application in this action is primarily to compel the mem-
bers of the Association to erect the presses of appellant
constructed under the conditions above referred to.

The action of the members of the Association in "ter-
minating" their relation of employment with appellant
is expressly authorized by the Clayton Amendment, and
was lawful prior thereto. *National Protective Association*
v. *Cumming*, 170 N. Y. 315, 324; *Paine Lumber Co.* v.
*Neal, supra*. The Clayton Act prohibits injunctions
restraining members of labor organizations "from ceasing
to perform any work or labor," or from "recommending,
advising or persuading others by peaceful and lawful
means so to do." *Paine Lumber Co.* v. *Neal, supra;
Bossert* v. *Dhuy, supra*. All that was done by anyone
in behalf of the Association or by or at the direction of
the defendants was recommending, advising or persuading
others not to work in handling or installing the presses
of appellant.

It is undisputed that the sole purpose of the defend-
ants and the Association is to improve the condition of
its members by securing them proper hours of work and
proper remuneration. Submitted to appellant, their
terms have been rejected upon the ground that appellant
refuses to recognize the rights of the organization "to
make any demands." This has been followed by the

workmen peacefully ceasing their employment in the establishment of appellant, and in men of their organization refusing to erect appellant's presses. There has been no interference with interstate commerce. There has been no threat made to any of appellant's customers. All that has been done is to bring to their attention the existence of the labor difficulties now existing between appellant and the Association. If these arc not peaceful and lawful means to be employed by a labor organization in effecting the proper purposes for which it is created, then it is obvious that there is no such thing as lawful conduct on the part of a labor organization as soon as it begins to be effective.

The appellant's entire claim of conspiracy rests not upon the unlawfulness of any act, but upon the effectiveness of the acts of the Association. The question of conspiracy, however, depends not upon the effectiveness of the means employed, but whether such means are lawful and proper. *Tri-City Central Trades Council* v. *American Steel Foundries*, 238 Fed. Rep. 728, 732.

Irreparable injury to property and property rights is neither alleged nor proven. The defendants and the Association did nothing more than tell purchasers that a strike existed at Battle Creek, and that it refused to permit its members to handle these presses in loading them into vehicles or in loading them from vehicles and erecting them in the plants of the purchasers.

It is impossible for appellant to successfully urge that the freedom of others to deal with any concern they choose can be abridged by injunction which would prevent such persons from ascertaining the true facts in connection with the commodity purchased or to be purchased. While it probably would enable appellant to sell more presses, if it could prevent these facts from becoming known, it would obviously be contrary to all known rules of equitable jurisprudence to give, by injunc-

tion, rights to appellant which affect primarily business interests of other employers and of its own customers. Again, if appellant could enjoin the machinists from refusing to handle these presses during the strike, such injunction would grant rights contrary to the freedom of men to contract, and workmen would thereby be forced to work for and be employed by an employer contrary to their desires and contrary to their legal and constitutional rights. The appellant has the right which no court can abridge—to employ whom it chooses. Likewise, the workingmen have the right to choose whom they will work for and under what conditions. And it is no more a conspiracy for the Association to refuse to handle appellant's presses during a strike of its members than it would be for appellant to refuse to allow its men to handle appellant's presses.

The property right which appellant alleges it possesses is nothing more than the right to solicit business under fair competition. This right is similar to the right that the defendants have—to work for whom they choose and under what conditions they choose. These rights are not property rights; they are personal rights, and stand on the same basis. There is no property interest of appellant threatened and no act done or threatened which in any way affects property rights. *Paine Lumber Co.* v. *Neal*, 212 Fed. Rep. 259, 267, 268.

There being no proof adduced upon the trial of irreparable injury to property and property rights, only the United States could apply for injunctive relief under the Sherman Act. *Paine Lumber Co.* v. *Neal*, 244 U. S. 459.

It cannot be successfully argued that the Clayton Act intended to grant further rights and privileges to employers to enjoin the members of labor organizations.

Appellant cannot maintain this suit in order to declare the organization to which the appellees belong unlawful under the Sherman Act. *National Fireproofing Co.* v.

*Mason Builders' Association,* 169 Fed. Rep. 259. To render an association or organization so unlawful, it must have been formed for the purpose of restraining trade or commerce among the several States or foreign nations, or such restraint must necessarily result from such combination. *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290; *Whitwell* v. *Continental Tobacco Co.,* 125 Fed. Rep. 454; *Gibbs* v. *McNeeley,* 118 Fed. Rep. 120; *Bigelow* v. *Calumet & Hecla Mining Co.,* 167 Fed. Rep. 704, 709; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471; *Bossert* v. *Dhuy,* 221 N. Y. 342. The activities of the defendants would not have a tendency to interfere with competition but would in fact make the competition more free.

There was no interference with interstate commerce. All complaints of appellant with respect to the delivery and erection of presses relate to the refusal of members of the Association to transport and handle them after they had reached the point of consignment. This refusal caused embarrassment in some instances in a local way, and appellant alleges that, because men employed by draymen refused to work, interstate commerce was interfered with. If this proposition be sound, then teamsters and machinists' helpers employed by draymen could not legally combine or cease from working, as in every instance, no matter how local the situation was, the contention would be raised that interstate commerce had been interfered with.

The fact that appellant's profits may be less because the defendants have directed the machinists not to handle and erect these presses, does not constitute interference with interstate commerce. *United States* v. *Knight Co.,* 156 U. S. 1, 12; *Anderson* v. *United States,* 171 U. S. 604, 615; *Pettibone* v. *United States,* 148 U. S. 197.

Labor of a human being is not a commodity or article of commerce. Clayton Act, § 6.

Irrespective of the Clayton Act, there were no facts adduced on the trial which would warrant the issuance of an injunction. *Bossert v. Dhuy, supra; Lindsay & Co. v. Montana Federation of Labor,* 37 Montana, 264; *Macauley Brothers v. Tierney,* 19 R. I. 255; *Ames v. Union Pacific Ry. Co.,* 62 Fed. Rep. 7, 14; *National Protective Association v. Cumming, supra; State v. Stockford,* 77 Connecticut, 227; *Gill Engraving Co. v. Doerr, supra; National Fireproofing Co. v. Mason Builders' Association, supra.*

MR. JUSTICE PITNEY delivered the opinion of the court.

This was a suit in equity brought by appellant in the District Court for the Southern District of New York for an injunction to restrain a course of conduct carried on by defendants in that District and vicinity in maintaining a boycott against the products of complainant's factory, in furtherance of a conspiracy to injure and destroy its good will, trade, and business—especially to obstruct and destroy its interstate trade. There was also a prayer for damages, but this has not been pressed and calls for no further mention. Complainant is a Michigan corporation and manufactures printing presses at a factory in Battle Creek, in that State, employing about 200 machinists in the factory in addition to 50 office-employees, traveling salesmen, and expert machinists or road men who supervise the erection of the presses for complainant's customers at their various places of business. The defendants who were brought into court and answered the bill are Emil J. Deering and William Bramley, sued individually and as business agents and representatives of District No. 15 of the International Association of Machinists, and Michael T. Neyland, sued individually and as business agent and representative of Local Lodge No. 328 of the same association. The Dis-

trict Council and the Lodge are unincorporated associations having headquarters in New York City, with numerous members resident in that city and vicinity. There were averments and proof to show that it was impracticable to bring all the members before the court and that the named defendants properly represented them; and those named were called upon to defend for all, pursuant to Equity Rule 38 (226 U. S. 659). Other jurisdictional averments need no particular mention. The District Court, on final hearing, dismissed the bill, 247 Fed. Rep. 192; the Circuit Court of Appeals affirmed its decree, 252 Fed. Rep. 722; and the present appeal was taken.

The jurisdiction of the federal court was invoked both by reason of diverse citizenship and on the ground that defendants were engaged in a conspiracy to restrain complainant's interstate trade and commerce in printing presses, contrary to the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209. The suit was begun before but brought to hearing after the passage of the Clayton Act of October 15, 1914, c. 323, 38 Stat. 730. Both parties invoked the provisions of the latter act, and both courts treated them as applicable. Complainant relied also upon the common law; but we shall deal first with the effect of the acts of Congress.

The facts of the case and the nature of the relief prayed are sufficiently set forth in the report of the decision of the Circuit Court of Appeals, 252 Fed. Rep. 722. The case was heard before Circuit Judges Rogers and Hough and District Judge Learned Hand. Judge Rogers, although in the minority, stated the case and the pleadings for the court (pp. 723–727) and delivered an opinion for reversal in which he correctly outlined (pp. 734–737) the facts as shown by the undisputed evidence—defendants having introduced none. Judges Hough and Hand followed with separate opinions for affirmance, not, however, disagreeing with Judge Rogers as to the facts. These may

be summarized as follows. Complainant conducts its business on the "open shop" policy, without discrimination against either union or non-union men. The individual defendants and the local organizations of which they are the representatives are affiliated with the International Association of Machinists, an unincorporated association having a membership of more than 60,000; and are united in a combination, to which the International Association also is a party, having the object of compelling complainant to unionize its factory and enforce the "closed shop," the eight-hour day, and the union scale of wages, by means of interfering with and restraining its interstate trade in the products of the factory. Complainant's principal manufacture is newspaper presses of large size and complicated mechanism, varying in weight from 10,000 to 100,000 pounds, and requiring a considerable force of labor and a considerable expenditure of time—a week or more—to handle, haul and erect them at the point of delivery. These presses are sold throughout the United States and in foreign countries; and, as they are especially designed for the production of daily papers, there is a large market for them in and about the City of New York. They are delivered there in the ordinary course of interstate commerce, the handling, hauling and installation work at destination being done by employees of the purchaser under the supervision of a specially skilled machinist supplied by complainant. The acts complained of and sought to be restrained have nothing to do with the conduct or management of the factory in Michigan, but solely with the installation and operation of the presses by complainant's customers. None of the defendants is or ever was an employee of complainant, and complainant at no time has had relations with either of the organizations that they represent. In August, 1913 (eight months before the filing of the bill), the International Association called a strike at complain-

ant's factory in Battle Creek, as a result of which union machinists to the number of about eleven in the factory and three who supervised the erection of presses in the field left complainant's employ. But the defection of so small a number did not materially interfere with the operation of the factory, and sales and shipments in interstate commerce continued. The acts complained of made up the details of an elaborate programme adopted and carried out by defendants and their organizations in and about the City of New York as part of a country-wide programme adopted by the International Association, for the purpose of enforcing a boycott of complainant's product. The acts embraced the following, with others: warning customers that it would be better for them not to purchase, or having purchased not to install, presses made by complainant, and threatening them with loss should they do so; threatening customers with sympathetic strikes in other trades; notifying a trucking company usually employed by customers to haul the presses not to do so, and threatening it with trouble if it should; inciting employees of the trucking company, and other men employed by customers of complainant, to strike against their respective employers in order to interfere with the hauling and installation of presses, and thus bring pressure to bear upon the customers; notifying repair shops not to do repair work on Duplex presses; coercing union men by threatening them with loss of union cards and with being blacklisted as "scabs" if they assisted in installing the presses; threatening an exposition company with a strike if it permitted complainant's presses to be exhibited; and resorting to a variety of other modes of preventing the sale of presses of complainant's manufacture in or about New York City, and delivery of them in interstate commerce, such as injuring and threatening to injure complainant's customers and prospective customers, and persons concerned

in hauling, handling, or installing the presses. In some cases the threats were undisguised, in other cases polite in form but none the less sinister in purpose and effect. All the judges of the Circuit Court of Appeals concurred in the view that defendants' conduct consisted essentially of efforts to render it impossible for complainant to carry on any commerce in printing presses between Michigan and New York; and that defendants had agreed to do and were endeavoring to accomplish the very thing pronounced unlawful by this court in *Loewe* v. *Lawlor,* 208 U. S. 274; 235 U. S. 522. The judges also agreed that the interference with interstate commerce was such as ought to be enjoined, unless the Clayton Act of October 15, 1914, forbade such injunction.

That act was passed after the beginning of the suit but more than two years before it was brought to hearing. We are clear that the courts below were right in giving effect to it; the real question being, whether they gave it the proper effect. In so far as the act (a) provided for relief by injunction to private suitors, (b) imposed conditions upon granting such relief under particular circumstances, and (c) otherwise modified the Sherman Act, it was effective from the time of its passage, and applicable to pending suits for injunction. Obviously, this form of relief operates only *in futuro,* and the right to it must be determined as of the time of the hearing. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 431–432. See, also, *United States* v. *The Schooner Peggy,* 1 Cranch, 103, 110; *Sampeyreac* v. *United States,* 7 Pet. 222, 239–240; *Mills* v. *Green,* 159 U. S. 651, 653; *Dinsmore* v. *Southern Express Co.,* 183 U. S. 115, 120; *Berry* v. *Davis,* 242 U. S. 468, 470.

The Clayton Act, in § 1, includes the Sherman Act in a definition of "anti-trust laws," and, in § 16 (38 Stat. 737), gives to private parties a right to relief by injunction in any court of the United States against threatened loss or

damage by a violation of the anti-trust laws, under the conditions and principles regulating the granting of such relief by courts of equity. Evidently this provision was intended to supplement the Sherman Act, under which some of the federal courts had held, as this court afterwards held in *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471, that a private party could not maintain a suit for injunction.

That complainant's business of manufacturing printing presses and disposing of them in commerce is a property right, entitled to protection against unlawful injury or interference; that unrestrained access to the channels of interstate commerce is necessary for the successful conduct of the business; that a widespread combination exists, to which defendants and the associations represented by them are parties, to hinder and obstruct complainant's interstate trade and commerce by the means that have been indicated; and that as a result of it complainant has sustained substantial damage to its interstate trade, and is threatened with further and irreparable loss and damage in the future; is proved by clear and undisputed evidence. Hence the right to an injunction is clear if the threatened loss is due to a violation of the Sherman Act as amended by the Clayton Act.

Looking first to the former act, the thing declared illegal by its first section (26 Stat. 209) is "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The accepted definition of a conspiracy is, a combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. *Pettibone* v. *United States,* 148 U. S. 197, 203. If the purpose be unlawful it may not be carried out even by means that otherwise would be legal; and although

the purpose be lawful it may not be carried out by criminal or unlawful means.

The substance of the matters here complained of is an interference with complainant's interstate trade, intended to have coercive effect upon complainant, and produced by what is commonly known as a "secondary boycott," that is, a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain ("primary boycott"), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it.

As we shall see, the recognized distinction between a primary and a secondary boycott is material to be considered upon the question of the proper construction of the Clayton Act. But, in determining the right to an injunction under that and the Sherman Act, it is of minor consequence whether either kind of boycott is lawful or unlawful at common law or under the statutes of particular States. Those acts, passed in the exercise of the power of Congress to regulate commerce among the States, are of paramount authority, and their prohibitions must be given full effect irrespective of whether the things prohibited are lawful or unlawful at common law or under local statutes.

In *Loewe* v. *Lawlor*, 208 U. S. 274, where there was an effort to compel plaintiffs to unionize their factory by preventing them from manufacturing articles intended for transportation beyond the State, and also by preventing vendees from reselling articles purchased from plaintiffs and negotiating with plaintiffs for further purchases, by means of a boycott of plaintiffs' products and of dealers who handled them, this court held that there was a conspiracy in restraint of trade actionable under § 7 of the

Sherman Act, and in that connection said (p. 293): "The act prohibits any combination whatever to secure action which essentially obstructs the free flow of commerce between the States, or restricts, in that regard, the liberty of a trader to engage in business. The combination charged falls within the class of restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of trade except on conditions that the combination imposes." . And when the case came before the court a second time, 235 U. S. 522, 534, it was held that the use of the primary and secondary boycott and the circulation of a list of "unfair dealers," intended to influence customers of plaintiffs and thus subdue the latter to the demands of the defendants, and having the effect of interfering with plaintiffs' interstate trade, was actionable.

In *Eastern States Retail Lumber Dealers' Association* v. *United States*, 234 U. S. 600, wholesale dealers were subjected to coercion merely through the circulation among retailers, who were members of the association, of information in the form of a kind of "black list," intended to influence the retailers to refrain from dealing with the listed wholesalers, and it was held that this constituted a violation of the Sherman Act. Referring to this decision, the court said, in *Lawlor* v. *Loewe*, 235 U. S. 522, 534: "That case establishes that, irrespective of compulsion or even agreement to observe its intimation, the circulation of a list of 'unfair dealers,' manifestly intended to put the ban upon those whose names appear therein, among an important body of possible customers combined with a view to joint action and in anticipation of such reports, is within the prohibitions of the Sherman Act if it is intended to restrain and restrains commerce among the States."

It is settled by these decisions that such a restraint produced by peaceable persuasion is as much within the

prohibition as one accomplished by force or threats of force; and it is not to be justified by the fact that the participants in the combination or conspiracy may have some object beneficial to themselves or their associates which possibly they might have been at liberty to pursue in the absence of the statute.

Upon the question whether the provisions of the Clayton Act forbade the grant of an injunction under the circumstances of the present case, the Circuit Court of Appeals was divided; the majority holding that under § 20, "perhaps in conjunction with section 6," there could be no injunction. These sections are set forth in the margin.[1] Defendants seek to derive from them some

---

[1] "Sec. 6. That the labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

"Sec. 20. That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining

authority for their conduct. As to § 6, it seems to us its principal importance in this discussion is for what it does *not* authorize, and for the limit it sets to the immunity conferred. The section assumes the normal objects of a labor organization to be legitimate, and declares that nothing in the anti-trust laws shall be construed to forbid the existence and operation of such organizations or to forbid their members from *lawfully* carrying out their *legitimate* objects; and that such an organization shall not be held in itself—merely because of its existence and operation—to be an illegal combination or conspiracy in restraint of trade. But there is nothing in the section to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade. And by no fair or permissible construction can it be taken as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for an illegal combination or conspiracy in restraint of trade as defined by the anti-trust laws.

The principal reliance is upon § 20. This regulates the granting of restraining orders and injunctions by the courts of the United States in a designated class of cases, with respect to (a) the terms and conditions of the relief and the practice to be pursued, and (b) the character of

---

or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

acts that are to be exempted from the restraint; and in the concluding words it declares (c) that none of the acts specified shall be held to be violations of any law of the United States. All its provisions are subject to a general qualification respecting the nature of the controversy and the parties affected. It is to be a "case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment."

The first paragraph merely puts into statutory form familiar restrictions upon the granting of injunctions already established and of general application in the equity practice of the courts of the United States. It is but declaratory of the law as it stood before. The second paragraph declares that "no *such* restraining order or injunction" shall prohibit certain conduct specified— manifestly still referring to a "case between an employer and employees, .. .. . involving, or growing out of, a dispute concerning terms or conditions of employment," as designated in the first paragraph. It is very clear that the restriction upon the use of the injunction is in favor only of those concerned as parties to such a dispute as is described. The words defining the permitted conduct include particular qualifications consistent with the general one respecting the nature of the case and dispute intended; and the concluding words, "nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States," are to be read in the light of the context, and mean only that those acts are not to be so held when committed by parties concerned in "a dispute concerning terms or conditions of employment." If the qualifying words are to have any effect, they must operate to confine the restriction upon the granting of injunctions, and also the relaxation

of the provisions of the anti-trust and other laws of the United States, to parties standing in proximate relation to a controversy such as is particularly described.

The majority of the Circuit Court of Appeals appear to have entertained the view that the words "employers and employees," as used in § 20, should be treated as referring to "the business class or clan to which the parties litigant respectively belong"; and that, as there had been a dispute at complainant's factory in Michigan concerning the conditions of employment there—a dispute created, it is said, if it did not exist before, by the act of the Machinists' Union in calling a strike at the factory—§ 20 operated to permit members of the Machinists' Union elsewhere—some 60,000 in number—although standing in no relation of employment under complainant, past, present, or prospective, to make that dispute their own and proceed to instigate sympathetic strikes, picketing, and boycotting against employers wholly unconnected with complainant's factory and having relations with complainant only in the way of purchasing its product in the ordinary course of interstate commerce—and this where there was no dispute between such employers and their employees respecting terms or conditions of employment.

We deem this construction altogether inadmissible. Section 20 must be given full effect according to its terms as an expression of the purpose of Congress; but it must be borne in mind that the section imposes an exceptional and extraordinary restriction upon the equity powers of the courts of the United States and upon the general operation of the anti-trust laws, a restriction in the nature of a special privilege or immunity to a particular class, with corresponding detriment to the general public; and it would violate rules of statutory construction having general application and far-reaching importance to enlarge that special privilege by resorting to a loose construction of

the section, not to speak of ignoring or slighting the qualifying words that are found in it. Full and fair effect will be given to every word if the exceptional privilege be confined—as the natural meaning of the words confines it—to those who are proximately and substantially concerned as parties to an actual dispute respecting the terms or conditions of their own employment, past, present, or prospective. The extensive construction adopted by the majority of the court below virtually ignores the effect of the qualifying words. Congress had in mind particular industrial controversies, not a general class war. "Terms or conditions of employment" are the only grounds of dispute recognized as adequate to bring into play the exemptions; and it would do violence to the guarded language employed were the exemption extended beyond the parties affected in a proximate and substantial, not merely a sentimental or sympathetic, sense by the cause of dispute.

Nor can § 20 be regarded as bringing in all members of a labor organization as parties to a "dispute concerning terms or conditions of employment" which proximately affects only a few of them, with the result of conferring upon any and all members,—no matter how many thousands there may be, nor how remote from the actual conflict—those exemptions which Congress in terms conferred only upon parties to the dispute. That would enlarge by construction the provisions of § 20, which contain no mention of labor organizations, so as to produce an inconsistency with § 6, which deals specifically with the subject and must be deemed to express the measure and limit of the immunity intended by Congress to be incident to mere membership in such an organization. At the same time it would virtually repeal by implication the prohibition of the Sherman Act, so far as labor organizations are concerned, notwithstanding repeals by implication are not favored; and in effect, as

was noted in *Loewe* v. *Lawlor,* 208 U. S. 274, 303–304, would confer upon voluntary associations of individuals formed within the States a control over commerce among the States that is denied to the governments of the States themselves.

The qualifying effect of the words descriptive of the nature of the dispute and the parties concerned is further borne out by the phrases defining the conduct that is not to be subjected to injunction or treated as a violation of the laws of the United States, that is to say: (a) "terminating any relation of employment, . . . or persuading others by peaceful and lawful means so to do"; (b) "attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working;" (c) "ceasing to patronize or to employ any party to such dispute, or . . . recommending, advising, or persuading others by peaceful and lawful means so to do"; (d) "paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits . . ."; (e) "doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto." The emphasis placed on the words "lawful" and "lawfully," "peaceful" and "peacefully," and the references to the dispute and the parties to it, strongly rebut a legislative intent to confer a general immunity for conduct violative of the anti-trust laws, or otherwise unlawful. The subject of the boycott is dealt with specifically in the "ceasing to patronize" provision, and by the clear force of the language employed the exemption is limited to pressure exerted upon a "party to such dispute" by means of "peaceful and *lawful*" influence upon neutrals. There is nothing here to justify defendants or the organizations they represent in using either threats or persuasion to bring about strikes or a cessation of work

·on the part of employees of complainant's customers or prospective customers, or of the trucking company employed by the customers, with the object of compelling such customers to withdraw or refrain from commercial relations with complainant, and of thereby constraining complainant to yield the matter in dispute. To instigate a sympathetic strike in aid of a secondary boycott cannot be deemed "peaceful and lawful" persuasion. In essence it is a threat to inflict damage upon the immediate employer, between whom and his employees no dispute exists, in order to bring him against his will into a concerted plan to inflict damage upon another employer who is in dispute with his employees.

The majority of the Circuit Court of Appeals, very properly treating the case as involving a secondary boycott, based the decision upon the view that it was the purpose of § 20 to legalize the secondary boycott "at least in so far as it rests on, or consists of, refusing to work for any one who deals with the principal offender." Characterizing the section as "blindly drawn," and conceding that the meaning attributed to it was broad, the court referred to the legislative history of the enactment as a warrant for the construction adopted. Let us consider this.

By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body. *Aldridge* v. *Williams*, 3 How. 9, 24; *United States* v. *Union Pacific R. R. Co.*, 91 U. S. 72, 79; *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, 318. But reports of committees of House or Senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. *Binns* v. *United States*

194 U. S. 486, 495. And this has been extended to include explanatory statements in the nature of a supplemental report made by the committee member in charge of a bill in course of passage. *Binns* v. *United States, supra; Pennsylvania R. R. Co.* v. *International Coal Co.,* 230 U. S. 184, 198–199; *United States* v. *Coca Cola Co.,* 241 U. S. 265, 281; *United States* v. *St. Paul, Minneapolis & Manitoba Ry. Co.,* 247 U. S. 310, 318.

In the case of the Clayton Act, the printed committee reports are not explicit with respect to the meaning of the "ceasing to patronize" clause of what is now § 20. (See House Rept. No. 627, 63d Cong., 2nd sess., pp. 33–36; Senate Rept. No. 698, 63d Cong., 2nd sess., pp. 29–31; the latter being a reproduction of the former.) But they contain extracts from judicial opinions and a then recent text-book sustaining the "primary boycott," and expressing an adverse view as to the secondary or coercive boycott; and, on the whole, are far from manifesting a purpose to relax the prohibition against restraints of trade in favor of the secondary boycott.

Moreover, the report was supplemented in this regard by the spokesman of the House committee (Mr. Webb) who had the bill in charge when it was under consideration by the House. The question whether the bill legalized the secondary boycott having been raised, it was emphatically and unequivocally answered by him in the negative.[1] The subject—he declared in substance or

---

[1] Extracts from Congressional Record, vol. 51, Part 10, 63d Cong., 2d sess.

(Page 9652.)

MR. VOLSTEAD. Would not this also legalize the secondary boycott? . . .

MR. WEBB. Mr. Chairman, I do not think it legalizes a secondary boycott.

MR. VOLSTEAD. Let me read the lines, if the gentleman will permit. And no such restraining order or injunction shall prohibit anyone—

"from ceasing to patronize *those who* [or to] employ any party to

effect—was under consideration when the bill was framed, and the section as reported was carefully prepared with the settled purpose of excluding the secondary boycott and confining boycotting to the parties to the dispute, allowing parties to cease to patronize and to ask others to cease

such dispute, or from recommending, advising, or persuading others by peaceful means so to do."

Now, does not the word "others" in that instance refer to others than parties to the dispute?

MR. WEBB. No; because it says in line 15:

"From ceasing to patronize or employ any parties to such dispute."

MR. VOLSTEAD. . . . Can there be any doubt this is intended or does, in fact, legalize the secondary boycott?

MR. WEBB. I will say frankly to my friend when this section was drawn it was drawn with the careful purpose not to legalize the secondary boycott, and we do not think it does. There may be a difference of opinion about it, but it is the opinion of the committee that it does not legalize the secondary boycott and is not intended to do so. It does legalize the primary boycott; it does legalize the strike; it does legalize persuading others to strike, to quit work, and the other acts mentioned in section 18 [now section 20], but we did not intend, I will say frankly, to legalize the secondary boycott.

(Page 9653.)

MR. WEBB. I will say this section was drawn two years or more ago and was drawn carefully, and those who drew this section drew it with the idea of excluding the secondary boycott. It passed the House, I think, by about 243 to 16, and the question of the secondary boycott was not raised then, because we understood so clearly it did not refer to or authorize the secondary boycott.

(Page 9658.)

MR. WEBB. Mr. Chairman, I should vote for the amendment offered by the gentlemen from Minnesota [Mr. Volstead] if I were not perfectly satisfied that it is taken care of in this section. The language the gentlemen reads does not authorize the secondary boycott, and he could not torture it into any such meaning. While it does authorize persons to cease to patronize the party to the dispute and to recommend to others to cease to patronize that same party to the dispute, that is not a secondary boycott, and you can not possibly make it mean a secondary boycott. Therefore this section does not authorize the secondary boycott.

I say again—and I speak for, I believe, practically every member

to patronize a party to the dispute; it was the opinion of the committee that it did not legalize the secondary boycott, it was not their purpose to authorize such a boycott, not a member of the committee would vote to do so; clarifying amendment was unnecessary; the section as reported expressed the real purpose so well that it could not be tortured into a meaning authorizing the secondary boycott. This was the final word of the House committee on the subject, and was uttered under such circumstances and with such impressive emphasis that it is not going too far to say that except for this exposition of the meaning of the section it would not have been enacted in the form in which it was reported. In substantially that form it became law; and since in our opinion its proper construction is entirely in accord with its purpose as thus declared, little need be added.

The extreme and harmful consequences of the construction adopted in the court below are not to be ignored. The present case furnishes an apt and convincing example. An ordinary controversy in a manufacturing establishment, said to concern the terms or conditions of employment there, has been held a sufficient occasion for imposing a general embargo upon the products of the establishment and a nation-wide blockade of the channels of interstate commerce against them, carried out by inciting sympathetic strikes and a secondary boycott against complainant's customers, to the great and incalculable damage of many innocent people far remote from any connection with or control over the original and actual dispute—people constituting, indeed, the general public

of the Judiciary Committee—that if this section did legalize the secondary boycott there would not be a man vote for it. It is not the purpose of the committee to authorize it, and I do not think any person in this House wants to do it. We confine the boycotting to the parties to the dispute, allowing parties to cease to patronize that party and to ask others to cease to patronize the party to the dispute.

upon whom the cost must ultimately fall, and whose vital interest in unobstructed commerce constituted the prime and paramount concern of Congress in enacting the anti-trust laws, of which the section under consideration forms after all a part.

Reaching the conclusion, as we do, that complainant has a clear right to an injunction under the Sherman Act as amended by the Clayton Act, it becomes unnecessary to consider whether a like result would follow under the common law or local statutes; there being no suggestion that relief thereunder could be broader than that to which complainant is entitled under the acts of Congress.

There should be an injunction against defendants and the associations represented by them, and all members of those associations, restraining them, according to the prayer of the bill, from interfering or attempting to interfere with the sale, transportation, or delivery in interstate commerce of any printing press or presses manufactured by complainant, or the transportation, carting, installation, use, operation, exhibition, display, or repairing of any such press or presses, or the performance of any contract or contracts made by complainant respecting the sale, transportation, delivery, or installation of any such press or presses, by causing or threatening to cause loss, damage, trouble, or inconvenience to any person, firm, or corporation concerned in the purchase, transportation, carting, installation, use, operation, exhibition, display, or repairing of any such press or presses, or the performance of any such contract or contracts; and also and especially from using any force, threats, command, direction, or even persuasion with the object or having the effect of causing any person or persons to decline employment, cease employment, or not seek employment, or to refrain from work or cease working under any person, firm, or corporation being a purchaser or prospective purchaser of any printing press or presses from complainant,

or engaged in hauling, carting, delivering, installing, handling, using, operating, or repairing any such press or presses for any customer of complainant. Other threatened conduct by defendants or the associations they represent, or the members of such associations, in furtherance of the secondary boycott should be included in the injunction according to the proofs.

Complainant is entitled to its costs in this court and in both courts below.

*Decree reversed, and the cause remanded to the District Court for further proceedings in conformity with this opinion.*

MR. JUSTICE BRANDEIS, dissenting, with whom MR. JUSTICE HOLMES and MR. JUSTICE CLARKE concur.

The Duplex Company, a manufacturer of newspaper printing presses, seeks to enjoin officials of the machinists' and affiliated unions from interfering with its business by inducing their members not to work for plaintiff or its customers in connection with the setting up of presses made by it.   Unlike *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, there is here no charge that defendants are inducing employees to break their contracts. . Nor is it now urged that defendants threaten acts of violence. But plaintiff insists that the acts complained of violate both the common law of New York and the Sherman Act and that, accordingly, it is entitled to relief by injunction under the state law and under § 16 of the Clayton Act, October 15, 1914, c. 323, 38 Stat. 730, 737.

The defendants admit interference with plaintiff's business but justify on the following ground: There are in the United States only four manufacturers of such presses; and they are in active competition. Between 1909 and 1913 the machinists' union induced three of

them to recognize and deal with the union, to grant the eight-hour day, to establish a minimum wage scale and to comply with other union requirements.   The fourth, the Duplex Company, refused to recognize the union; insisted upon conducting its factory on the open shop principle; refused to introduce the eight-hour day and operated for the most part, ten hours a day; refused to establish a minimum wage scale; and disregarded other union standards.   Thereupon two of the three manufacturers who had assented to union conditions, notified the union that they should be obliged to terminate their agreements with it unless their competitor, the Duplex Company, also entered into the agreement with the union, which, in giving more favorable terms to labor, imposed correspondingly greater burdens upon the employer.   Because the Duplex Company refused to enter into such an agreement and in order to induce it to do so, the machinists' union declared a strike at its factory, and in aid of that strike instructed its members and the members of affiliated unions not to work on the installation of presses which plaintiff had delivered in New York   Defendants insist that by the common law of New York, where the acts complained of were done, and where this suit was brought, and also by § 20 of the Clayton Act, 38 Stat. 730, 738, the facts constitute a justification for this interference with plaintiff's business.

*First.*   As to the rights at common law:  Defendants' justification is that of self-interest.   They have supported the strike at the employer's factory by a strike elsewhere against its product.   They have injured the plaintiff, not maliciously, but in self-defense.   They contend that the Duplex Company's refusal to deal with the machinists' union and to observe its standards threatened the interest not only of such union members as were its factory employees, but even more of all members of the several affiliated unions employed by plaintiff's competitors and

by others whose more advanced standards the plaintiff was, in reality, attacking; and that none of the defendants and no person whom they are endeavoring to induce to refrain from working in connection with the setting up of presses made by plaintiff is an outsider, an interloper. In other words, that the contest between the company and the machinists' union involves vitally the interest of every person whose coöperation is sought. May not all with a common interest join in refusing to expend their labor upon articles whose very production constitutes an attack upon their standard of living and the institution which they are convinced supports it? Applying common-law principles the answer should, in my opinion, be: Yes, if as matter of fact those who so coöperate have a common interest.

The change in the law by which strikes once illegal and even criminal are now recognized as lawful was effected in America largely without the intervention of legislation. This reversal of a common-law rule was not due to the rejection by the courts of one principle and the adoption in its stead of another, but to a better realization of the facts of industrial life. It is conceded that, although the strike of the workmen in plaintiff's factory injured its business, the strike was not an actionable wrong; because the obvious self-interest of the strikers constituted a justification. See *Pickett* v. *Walsh*, 192 Massachusetts, 572. Formerly courts held that self-interest could not be so served. Commons, History of Labor in the United States, vol. 2, c. 5. But even after strikes to raise wages or reduce hours were held to be legal because of the self-interest, some courts held that there was not sufficient causal relationship between a strike to unionize a shop and the self-interest of the strikers to justify injuries inflicted. *Plant* v. *Woods*, 176 Massachusetts, 492; *Lucke* v. *Clothing Cutters' Assembly*, 77 Maryland, 396; *Erdman* v. *Mitchell*, 207 Pa. St. 79.

But other courts, repeating the same legal formula, found that there was justification, because they viewed the facts differently. *National Protective Association* v. *Cumming*, 170 N. Y. 315; *Kemp* v. *Division No. 241*, 255 Illinois, 213; *Roddy* v. *United Mine Workers*, 41 Oklahoma, 621. When centralization in the control of business brought its corresponding centralization in the organization of workingmen, new facts had to be appraised. A single employer might, as in this case, threaten the standing of the whole organization and the standards of all its members; and when he did so the union, in order to protect itself, would naturally refuse to work on his materials wherever found. When such a situation was first presented to the courts, judges concluded that the intervention of the purchaser of the materials established an insulation through which the direct relationship of the employer and the workingmen did not penetrate; and the strike against the material was considered a strike against the purchaser by unaffected third parties. *Burnham* v. *Dowd*, 217 Massachusetts, 351; *Purvis* v. *United Brotherhood*, 214 Pa. St. 348; *Booth* v. *Burgess*, 72 N. J. Eq. 181. But other courts, with better appreciation of the facts of industry, recognized the unity of interest throughout the union, and that, in refusing to work on materials which threatened it, the union was only refusing to aid in destroying itself. *Bossert* v. *Dhuy*, 221 N. Y. 342; *Cohn & Roth Electric Co.* v. *Bricklayers Union*, 92 Connecticut, 161; *Gill Engraving Co.* v. *Doerr*, 214 Fed. Rep. 111; *State* v. *Van Pelt*, 136 N. C. 633; *Grant Construction Co.* v. *St. Paul Building Trades Council*, 136 Minnesota, 167; *Pierce* v. *Stablemen's Union*, 156 California, 70, 76.

So, in the case at bar, deciding a question of fact upon the evidence introduced and matters of common knowledge, I should say, as the two lower courts apparently have said, that the defendants and those from whom they

sought coöperation have a common interest which the plaintiff threatened. This view is in harmony with the views of the Court of Appeals of New York. For in New York, although boycotts like that in *Loewe* v. *Lawlor,* 208 U. S. 274, are illegal because they are conducted not against a product but against those who deal in it and are carried out by a combination of persons not united by common interest but only by sympathy, *Auburn Draying Co.* v. *Wardell,* 227 N. Y. 1, it is lawful for all members of a union by whomever employed to refuse to handle materials whose production weakens the union. *Bossert* v. *Dhuy, supra; P. Reardon, Inc.,* v. *Caton,* 189 App. Div. 501; compare *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471. "The voluntary adoption of a rule not to work on non-union made material and its enforcement differs only in degree from such voluntary rule and its enforcement in a particular case. Such a determination also differs entirely from a general boycott of a particular dealer or manufacturer with a malicious intent and purpose to destroy the good will or business of such dealer or manufacturer." *Bossert* v. *Dhuy, supra,* p. 355. In my opinion, therefore, plaintiff had no cause of action by the common law of New York.

*Second.* As to the anti-trust laws of the United States: Section 20, of the Clayton Act, declares,—

"Nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

The acts which are thus referred to are, whether performed singly or in concert,—"Terminating any relation of employment, or . . . ceasing to perform any work or labor, or . . . recommending, advising, or persuading others by peaceful means so to do; or . . . attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or . . . peacefully per-

suading any person to work or to abstain from working; or
.   .   .   ceasing to patronize or to employ any party to
such dispute, or   .   .   .   recommending, advising, or per-
suading others by peaceful and lawful means so to do;
or   .   .   .   paying or giving to, or withholding from,
any person engaged in such dispute, any strike benefits
or other moneys or things of value; or   .   .   .   peace-
ably assembling in a lawful manner, and for lawful pur-
poses; or   .   .   .   doing any act or thing which might
lawfully be done in the absence of such dispute by any
party thereto."

This statute was the fruit of unceasing agitation, which
extended over more than twenty years and was designed
to equalize before the law the position of workingmen and
employer as industrial combatants.   Aside from the use
of the injunction, the chief source of dissatisfaction with
the existing law lay in the doctrine of malicious combin-
ation,[1] and, in many parts of the country, in the judicial
declarations of the illegality at common law of picketing
and persuading others to leave work.   The grounds for
objection to the latter are obvious.   The objection to the
doctrine of malicious combinations requires some explan-

---

[1] See "Malice and Unlawful Interference," Ernest Freund, 11 Harv.
L. Rev. 449, 461; "Rights of Traders and Laborers," Edward F. Mc-
Clennen, 16 Harv. L. Rev. 237, 244; "Crucial Issues in Labor Litiga-
tion," Jeremiah Smith, 20 Harv. L. Rev. 429, 451; Principles of Labor
Legislation, Commons and Andrews, pp. 95–116; Hoxie, Trade Union-
ism in the United States, p. 231; Groat, Attitude of American Courts
Towards Labor Cases, pp. 76–77; 221; 246; J. W. Bryan, The Develop-
ment of the English Law of Conspiracy, p. 147, *et seq.*

Report of the Industrial Commission, 1901, vol. XVII, p. cxiv, pp.
515, 556; Report of Royal Commission on Trade Disputes and Trade
Combinations, 1906, p. 12; Report of Commission on Industrial Re-
lations, 1915, p. 135; p. 377.

For attempts to reach this doctrine by legislation see also 52nd
Cong., H. R. 6640, § 1; 56th Cong., H. R. 11667, § 7; 57th Cong., S.
649, § 7.

ation. By virtue of that doctrine, damage resulting from conduct such as striking or withholding patronage or persuading others to do either, which without more might be *damnum absque injuria* because the result of trade competition, became actionable when done for a purpose which a judge considered socially or economically harmful and therefore branded as malicious and unlawful.[1] It was objected that, due largely to environment, the social and economic ideas of judges, which thus became translated into law, were prejudicial to a position of equality between workingman and employer; that due to this dependence upon the individual opinion of judges great confusion existed as to what purposes were lawful and what unlawful;[2] and that in any event Congress, not the judges, was the body which should declare what public policy in regard to the industrial struggle demands.

By 1914 the ideas of the advocates of legislation had fairly crystallized upon the manner in which the inequality and uncertainty of the law should be removed. It was to

---

[1] See James Wallace Bryan, The Development of the English Law of Conspiracy:—

"We find little difficulty in attributing the illegality of combinations to strike or otherwise to advance the interests of labor, not to the material loss inflicted upon the employer concerned, but to the harm supposed to result from their activities to the public at large." And since the judge or jury believe the conduct socially bad and since it is admittedly done intentionally, not inadvertently, they declare that the actors are animated by malice which negatives the justification of "fair competition," e. g., Lord Bowen in *Mogul S. S. Co.* v. *McGregor, Gow & Co.*, 1892 A. C. 25, "intentionally to do that which is calculated . . . to damage . . . and does damage another in his property or trade is actionable if done without just cause or excuse, and . . . is what the law calls a malicious injury."

[2] See A. V. Dicey, "The Combination Laws as Illustrating the Relation Between Law and Opinion in England During the Nineteenth Century," 17 Harv. L. Rev. 511, 532: "The very confusion of the present state of the law corresponds with and illustrates a confused state of opinion."

be done by expressly legalizing certain acts regardless of the effects produced by them upon other persons. As to them Congress was to extract the element of *injuria* from the damages thereby inflicted, instead of leaving judges to determine according to their own economic and social views whether the damage inflicted on an employer in an industrial struggle was *damnum absque injuria*, because an incident of trade competition, or a legal injury, because in their opinion, economically and socially objectionable. This idea was presented to the committees which reported the Clayton Act.[1] The resulting law set out certain acts which had previously been held unlawful, whenever courts had disapproved of the ends for which they were performed; it then declared that, when these acts were committed in the course of an industrial dispute, they should not be held to violate any law of the United States. In other words the Clayton Act substituted the opinion of Congress as to the propriety of the purpose for that of differing judges; and thereby it declared that the relations between employers of labor and workingmen were competitive relations, that organized competition was not harmful and that it justified injuries necessarily inflicted in its course.[2] Both the

---

[1] It was said that this doctrine "completely unsettle(d) the law . . . and set up the chancellor in the midst of the labor organization at the inception of a strike as an arbiter of their conduct as well as a controller of their fates." 62nd Cong., 2nd sess. Hearings Before a Subcommittee of the Senate Committee on the Judiciary on H. R. 23635, p. 429.

Again, it was pointed out that the incorporation of this idea in the Sherman Law had "done violence to the right to strike—to cease work collectively . . . and to the right to withhold patronage and to agree to withhold patronage." Brief by Samuel Gompers, Hearings before the House Committee on the Judiciary on Trust Legislation, 63rd Cong., 2nd sess., vol. 2, p. 1808.

[2] Compare the following: "There are apparently, only two lines of action possible: First to restrict the rights and powers of employers

majority and the minority report of the House Committee indicate that such was its purpose.[1] If, therefore, the act applies to the case at bar, the acts here complained of cannot "be considered or held to be violations of any law of the United States," and, hence, do not violate the Sherman Act.

The Duplex Company contends that § 20 of the Clayton Act does not apply to the case at bar, because it is restricted to cases "between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment"; whereas the case at bar arises between an employer in Michigan and workingmen in New York not in its employ, and does not involve their conditions of employment. But Congress did not restrict the provision to employers and workingmen *in their em-*

---

to correspond in substance to the powers and rights now allowed to trade unions, and second, to remove all restrictions which now prevent the freedom of action of both parties to industrial disputes, retaining only the ordinary civil and criminal restraints for the preservation of life, property and the public peace. The first method has been tried and failed absolutely. . . . The only method therefore seems to be the removal of all restrictions upon both parties, thus legalizing the strike, the lockout, the boycott, the blacklist, the bringing in of strikebreakers, and peaceful picketing." Report of the Committee on Industrial Relations, 1915, p. 136.

[1] The majority declared that the section sets out "specific acts which the best opinion of the courts holds to be within the right of parties involved upon one side or the other of a trades dispute," which it has been necessary to affirm because of "the divergent views which the courts have expressed on the subject and the difference between courts in the application of recognized rules." The minority insisted that the section prescribes "a set rule forbidding under any circumstances the enjoining of certain acts which may or may not be actuated by a malicious motive or be done for the purpose of working an unlawful injury, etc." 63rd Cong., 2nd sess., House Report 627, p. 30; *id.* Part 2, Appendix A, p. 20.

*ploy*. By including "employers and employees" and "persons employed and persons seeking employment" it showed that it was not aiming merely at a legal relationship between a specific employer and his employees. Furthermore, the plaintiff's contention proves too much. If the words are to receive a strict technical construction, the statute will have no application to disputes between employers of labor and workingmen, since the very acts to which it applies sever the continuity of the legal relationship. *Iron Moulders' Union* v. *Allis-Chalmers Co.*, 166 Fed. Rep. 45, 52–53; *Louisville, Evansville & St. Louis R. R. Co.* v. *Wilson*, 138 U. S. 501, 505; cf. *Rex* v. *Neilson*, 44 N. S. 488, 491. The further contention that this case is not one arising out of a dispute concerning the conditions of work of one of the parties is, in my opinion, founded upon a misconception of the facts.

Because I have come to the conclusion that both the common law of a State and a statute of the United States declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest, I do not wish to be understood as attaching any constitutional or moral sanction to that right. All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat.