## UNITED STATES v. ALEXANDER & REID CO. et al.[1]

### (District Court, S. D. New York. April 12, 1922.)

1. Criminal law ⊂⊃304(2)—Judicial notice taken of historical facts.
    Court will take judicial notice of historical facts.

2. Criminal law ⊂⊃980(1)—Sentences should .be less severe, where accused pleads guilty.
    Defendants, aware of their guilt, but who nevertheless contumaciously stand out on a plea of not guilty, are entitled to much less consideration in fixing their sentences than those who candidly acknowledge guilt and throw themselves on the mercy of the court.

Prosecution by the United States against Alexander & Reid Company and others under the Sherman Act. Defendants plead guilty.

William Hayward, U. S. Atty., of New York City, and David L. Podell, Leland B. Duer, Benjamin S. Kirsh, Nathan Probst, Jr., Susan Brandeis, and Raymond L. Wise, Sp. Asst. U. S. Attys., all of New York City.

Winthrop & Stimson (by Henry L. Stimson), Phillips & Avery (by Frank M. Avery), Carl F. Whitney, Arnstein & Levy (by Samuel Levy), Pitkin, Rosensohn & Henderson (by Saumel J. Rosensohn), and Eidlitz & Hulse (by Cornelius J. Sullivan, Jr.), all of New York City, for defendants.

VAN FLEET, District Judge. This is a prosecution based upon an alleged violation of section 1 of "An act to protect trade and commerce against unlawful restraints and monopolies," passed by Congress July 2, 1890, commonly referred to as the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830). The first section (section 8820) reads:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or both said punishments, in the discretion of the court."

[1] It will be observed that in its legal aspect the criminal offenses denounced under that section are but misdemeanors, but nevertheless the act was intended as a protection to the public against unlawful practices in interstate commerce, and has throughout its history subserved a very important function. Perhaps, however, there has not previously been a prosecution brought under its criminal features of

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
[1] Published by request of the United States District Attorney.

greater importance than the present. A brief historical statement of the conditions out of which the prosecution arose will, I think, emphasize this fact. These facts are gathered, not only from statements of counsel at the argument, but from sources of such common knowledge that the court is at liberty to take judicial cognizance of them.

The state Legislature of this state, as far back as April, 1920, declared that an emergency existed in the large cities of this state, due to the acute shortage of housing facilities. That finding has since been emphasized and confirmed by the courts, both state and federal, including the Supreme Court of the United States; all of them declaring that the finding of the Legislature that such an emergency existed was well founded. And there can be no question that such condition has vitally affected the shelter, the comfort, and well-being, and indeed the health, of this great community.

While the primary cause of these conditions was perhaps largely the outgrowth of the World War, and while in a large measure doubtless the rent profiteer contributed to the hardship, there can be no question but that this situation was aggravated in grave measure by certain unlawful combinations among groups of men engaged in the business of supplying building materials of the character with which we are here dealing. Authoritative records, including the report of the United States Senate Reconstruction Committee, as well as of the Department of Labor, show that during the war building materials were the highest priced of all general commodities, as compared with pre-war prices, and that since the war, of all such commodities, building materials have been the slowest to recede, and that to-day they are unquestionably the highest priced of all general commodities as compared with pre-war prices, and we are now more than three years beyond the war period or the actual cessation of hostilities.

Nor is this situation confined to the great city of New York or its immediate environment, but it affects similarly every large city throughout the country from coast to coast. Ample facts have been adduced showing that these abnormal prices of building materials, as well as the lack of new building construction and the resultant lack of proper housing for the multitudes of human beings in the large cities throughout the country, are traceable directly to an interlocking series of criminal conspiracies and combinations in the building trades, of which this case is typical. The particular commodity here involved, tile, is one which, as is well known, is used in every modern apartment house and other structure for human habitation, principally for purposes of sanitation, and it thereby contributes directly toward cleanliness and the preservation of the health of the community.

It was out of a very thorough and far-reaching investigation, disclosing the conditions I have indicated, that the indictment in this case sprang. The plea of guilty of these defendants admits the allegations of the fourth count of the indictment, which charges a series of vicious practices on the part of this trade association or combination among these defendants, the only effect of which was a clear restraint upon the trade and commerce of the community in the particular commodity with which they were dealing.

The first of these practices provided for in their Articles is the "stop notice." In brief, the stop notice meant this: Upon the request of any one member, the secretary of the association would send out a so-called stop notice to all of the other members of the association. The effect of that notice was an immediate boycott of all members of the association against the individual or particular contractor engaged in erecting an apartment house, which would completely tie his hands and paralyze his work until he came to terms with the member causing the issuance of the notice, regardless of which was in the right in the matter in difference between them. The employment of this method of boycott has been justly and severely condemned by the courts, particularly in the Duplex Case, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

The second of these practices was the so-called "protection card." This practice was originated and utilized by a group of several among the defendants, who were more or less the leaders in the business. Upon the request of any one member, the secretary would circulate among other members a notice or card, giving the location of a job and the name of a contractor, who either had awarded a contract or was about to award a contract for tile work. This card was in sum and substance a notice to the other members to ignore that contractor, and not to bid upon any work he required to be done, leaving the field clear for the member who had requested the protection card, so that he might secure, not only the contract for the original work, but for any extra or additional work necessary to complete it, and this upon his own terms. It left the builder completely at the mercy of the individual defendant as to price, and all other terms and conditions of the contract.

The next provision was the "keep off" notice, which some of the leading members utilized through the medium of the secretary, when they desired other members to refrain from bidding upon a prospective job.

Finally, there was the blacklisting or collection system, known in the association as forms numbered 1, 2, and 3. Under this practice of collecting alleged debts, the defendants were not content with the usual processes of the law. If any member of the combination made a claim against a contractor for moneys claimed to be due, whether it was just or unjust, the contractor was served with notice to appear before a committee of the organization to act as his judges, and on his failure to make appearance he was promptly blacklisted. Thereupon he became a marked man among the members of this combination. Any bids he thereafter requested were without his knowledge arbitrarily increased by the secretary of this association, and the moneys claimed to be due any member of the combination were in that way collected through this method of fraudulent bidding, and in some instances, the amount claimed to be due was collected more than once and from persons who never could have incurred the indebtedness, because they had had no part or parcel in the original transaction out of which the alleged claim arose.

Finally, the plea of the defendants admits, as alleged in this fourth count, that they indulged in the wholly vicious and unjustifiable practice of what is known as "accommodation bidding"; that is, they would previously determine who of their number was to receive a particular contract, and then collusively arrange their bids so that the transaction, while it appeared to the contractor receiving the bids as being competitive, would not be so in fact.

With these practices prevailing in this particular association, and with like combinations holding a grip throughout the country upon the various building trades, it is not a matter for surprise that the building industry throughout the great cities of the country has been for several years virtually at a standstill. This is but a brief and inadequate statement of the nature of this nefarious and absolutely indefensible method of dealing with the public, which the evidence placed before the court has tended to portray.

[2] As a result of an inquiry into the facts as to the participation of the various defendants, the court is satisfied that the mere imposition of a fine as to certain of the more flagrant instances will afford no cure, nor act as a deterrent, which is the main object of punishment; that, while it may be true, as urged at the argument, that in the past the provisions of the Sherman Law authorizing jail sentences have rarely been enforced, the situation presented here is of such character that the time has come to put a stop to these criminal practices; and in my judgment the only effective way of doing it is to invoke and bring to life those features of this great act which provide for imprisonment in all instances where the facts warrant it. Of course, this does not apply to all the defendants, nor indeed to many of them; and, moreover, the court is bound to take strongly into consideration in dealing with all the defendants the fact that they have appeared here and pleaded guilty, thus saving the government a long and expensive trial; and while I feel constrained to impose imprisonment on some, my judgment even in those instances will be much less severe than upon a conviction after trial. Defendants aware of their guilt, but who nevertheless contumaciously stand out on a plea of not guilty, are entitled to much less consideration than those who candidly acknowledge guilt and throw themselves upon the mercy of the court.

With these preliminary suggestions, I shall proceed to pronounce judgment.