## DECORATIVE STONE CO. v. BUILDING TRADES COUNCIL OF WESTCHESTER COUNTY et al.

(District Court, S. D. New York. March 26, 1927.)

Monopolies ⟨⟐⟩14—Combination of local stone workers and labor unions to eliminate outside competition held "unlawful restraint of interstate commerce" (Comp. St. § 8820 et seq.).

Combination of local stone workers, unions, and union agents in New York City, having for its purpose the elimination of competition of artificial stone manufacturers outside of the metropolitan district, including other states, accomplished by refusal to work on materials intended to be used in construction of buildings in which materials manufactured by such outside manufacturers were used and by threats of strike, *held* to constitute unlawful conspiracy in restraint of interstate commerce, and will be enjoined under Act July 2, 1890 (26 Stat. 209 [Comp. St. § 8820 et seq.]).

In Equity. Suit by the Decorative Stone Company against the Building Trades Council of Westchester County and others to enjoin continued violation of Act July 2, 1890, c. 647, 26 Stat. 209, by the defendants to the plaintiff's damage. Decree for plaintiff.

Gleason, McLanahan, Merritt & Ingraham, of New York City (Walter Gordon Merritt and John W. Simpson, 2d, both of New York City, of counsel), for plaintiff.

Frank P. Walsh, of New York City (Henry T. Hunt and Harold Stern, both of New York City, of counsel), for defendants.

THACHER, District Judge. This is a suit by the Decorative Stone Company, a corporation engaged at New Haven, Conn., in the business of manufacturing artificial stone for use in the construction of buildings, against a number of trade unions whose members are employed in the building trades and certain individuals active in the affairs of these unions. The defendants are charged with combination and conspiracy to prevent, obstruct, and restrain the plaintiff from engaging in interstate commerce in the sale and supply of its product in New York City and its environs, a territory which is designated by the defendants as "the metropolitan district." The bill prays for an injunction, restraining further interference with plaintiff's interstate business, and for damages.

For many years the plaintiff has been engaged in the business of manufacturing and finishing artificial stone, generally known as "cast stone," in its plant located at New Haven, Conn., and has solicited orders for the sale of its product from contractors engaged in the construction of buildings in New York and other states. Cast stone is manufactured by preparing a mixture of cement, crushed stone, and materials for coloring the product, which is liquified with water and poured into molds, where it is allowed to harden, and then removed from the molds to be seasoned for a time, and then finished by cutting or chipping the surface of the stone, so that it is ready for shipment and delivery to the building under construction, where it is installed by the workmen employed in constructing the building. All of the plaintiff's cast stone is shipped to building contractors in a completely finished state, ready for erection in the building, and no erection work is ordinarily performed by the plaintiff. For its cast stone, so manufactured, there is a favorable and active market in New York City and its vicinity; but it is contended that the plaintiff has been excluded from this market by the acts of the defendants, which are alleged to be in unlawful restraint of interstate commerce.

The defendant Journeymen Stone Cutters' Association of North America is a voluntary unincorporated association of mechanics engaged in the stone-cutting trade, which has a constitution, by-laws, and officers, and derives a large income from assessments upon its members. Its principal office is in Indianapolis, Ind., and its membership numbers about 5,000, being divided into over 150 local unions, situated in the different states of the United States. Each of these affiliated local unions is a voluntary unincorporated association, having its own by-laws, officers, and an established income, derived from assessments on its respective members. This national union and its affiliated unions claim jurisdiction over all stone cutters, carvers, curb cutters, curb setters, bridge cutters, planer men, lathe men, and carborundum mold machine operators, engaged in the cutting, patching, and fabrication of all artificial stone. The defendant Joseph Wall is, and was at all times material herein, a member of the executive board of this union.

The defendant Journeymen Stone Cutters' Association of New York and vicinity is one of the local unions affiliated with the Journeymen Stone Cutters' Association of North America, and is a voluntary unincorporated association of over seven members, claiming jurisdiction in the so-called metropolitan district, which is defined by this union as "a territory of 25 miles from the New York boundary line, including all of Long Island and also any locality within 25 miles of the Newark city line to the Hudson river." The defendant John Cronin is, and was at all times material herein, the business agent and representative of this union.

The defendant Machine Stone Workers', Rubbers', and Helpers' Association of New York and Newark Vicinity is a voluntary unincorporated association of over seven members, claiming jurisdiction over all machine stone workers, rubbers, and helpers within the metropolitan district. The defendant Thomas O'Leary is, and was at all times material herein, the business agent and representative thereof.

The defendant Building Trades Council of Westchester County is a voluntary unincorporated association of more than seven members, and is a federation of business agents of all the building trades unions in Westchester county, including the defendant Cronin, as business agent of the Journeymen Stone Cutters' Association of New York and Vicinity, and defendant O'Leary, as business agent of Machine Workers', Rubbers', and Helpers'

Association of New York and Newark Vicinity. This Building Trades Council asserts the power to call and enforce strikes on all building operations in Westchester county; where the members of any of the unions represented in the Council are employed. The building trades unions affiliated with this council are about 67 in number, and represent every organized craft or occupation employed in the construction of a modern building. In Westchester county the building trades are 100 per cent. unionized, and the council therefore has and exercises complete control over labor employed in building construction. The council holds regular meetings, at which its members report. If any business agent has a so-called "grievance" against any building operation in said county, he reports the same in such meeting and requests the support of the council. If the council votes to assist the aggrieved business agent, a strike is called by all of the affiliated unions working on the building against which the grievance has been filed. Through the organization of this and other unions in all of the trades engaged in the work of building construction within the metropolitan district, it is quite impracticable in a business sense to construct a building in the metropolitan district in the construction of which nonunion men are employed.

The evidence clearly discloses that for several years prior to December, 1923, the Machine Stone Workers', Rubbers', and Helpers' Association of New York and Newark Vicinity, O'Leary's organization, has habitually objected to the use of cast stone in any building under construction in the metropolitan district, unless such cast stone is manufactured in plants employing members of this union. Until very recently this union was not affiliated with any unions claiming jurisdiction outside of the metropolitan district. At no time has it been affiliated with any union in New Haven, Conn.; nor has there been any organization of the trades included in its membership in New Haven at any time.

It appears that for several years past— at least since 1917—O'Leary, the representative of this local union, has, with an extraordinary degree of persistent loyalty to his union, followed the building operations in the metropolitan district to ascertain whether or not any cast stone manufactured by any plant in which the members of his union were not employed was being used. Wherever he discovered that such cast stone was being used, if it happened that the plant in which his men were employed was engaged in finishing natural stone for the same building, these men

refused to work on any material intended for the building until either the contract for cast stone was canceled, and the stone, if delivered, removed from the premises, or the matter was adjusted to the satisfaction of his union by assurances that, if the stone already delivered was used, with the permission of the union, the contractor would never again construct a building with such stone. In this connection lists of firms regarded by O'Leary's organization as "fair" were distributed to the contractors. It is to be noted that in these cases, where the members of O'Leary's organization refused to work, they were in no instance directly employed in the construction of the building. They were employed by a manufacturer who had contracted to furnish materials for its construction to be used by others.

Thus we have men employed in a factory refusing to work upon materials, not because of conditions existent in their employment, but because their employer had contracted to furnish materials intended to be used in the construction of a building in which other materials were to be used which had not been manufactured by members of their organization.

But O'Leary's objections did not stop there. In most instances the stone to which he objected was being furnished to buildings with the construction of which his men had not the slightest connection. In all cases grievances were filed by O'Leary with the trades councils in which all the other trades engaged in the construction of the building were represented, and in most instances these grievances were supported by the other trades, who if the matter could not be adjusted to the satisfaction of O'Leary's organization, refused to continue work upon the building and thus prevented further construction until satisfactory adjustment was made either by the cancellation of the contract for the delivery of the stone, the removal of the stone, if delivered, or an agreement by the contractor that, if permitted to use the stone already delivered, such stone would not be used in any other building operations by that contractor. The duress thus exercised was, in at least one instance shown by the evidence, reinforced by a threat to call strikes on other building operations in the metropolitan district being simultaneously carried on by the same contractor.

The clear inference from the testimony is that the purpose and effect of this system has been to virtually exclude from the New York market cast stone manufactured outside of the metropolitan district. O'Leary himself admits that he did not let any such stone get by him, if he could help it. He was persistently active, unfailingly loyal to his own organization, and thoroughly effective in the results which he accomplished. I am quite certain that he would resent any suggestion to the contrary.

The purpose which he had in mind, and the interest which he served, is important. He was interested in the welfare of the men in his own organization, and it is clear from his own testimony that he intended, in so far as he could, to see to it that their economic situation should not be impaired by the competition of stone manufactured in plants other than those in which they were employed. He fully appreciated that cast stone manufactured outside of the metropolitan district was being offered for sale at prices far below the prices demanded by the employers of his men. In one instance, where through his efforts the construction of a large school building has been completely interrupted for many months, the contract for cast stone awarded to the plaintiff in this suit was awarded upon a bid of approximately $18,000. Another plant outside of the metropolitan district submitted a bid of approximately $28,000, whereas the only firm regarded as "fair" by O'Leary's organization which bid upon the contract submitted a bid of something in excess of $60,000.

The purpose to exclude from the greatest market in the United States cast stone produced by manufacturers outside of the metropolitan district, which could be sold at prices far below those being demanded by manufacturers within the district, is, I think, clearly established by the evidence; and while there is no direct evidence that the manufacturers within the district, who were the immediate and direct beneficiaries of this exclusion of their competitors, actively participated in these efforts; they were the beneficiaries of the systematic boycott of competing materials. Thus the case presented is not the ordinary controversy between employer and employee, having to do with the terms and conditions of employment, but involves a conspiracy and combination, monopolistic in character on the part of employees, to exclude from the market competition which might affect the economic interests of their employers, and thus indirectly, as O'Leary himself put it, "leave his men out of work," and reduce their wages.

In all that O'Leary did he had the earnest support and co-operation of Cronin, repre-

senting the local Journeymen Stone Cutters' Association, the members of which were employed in the same plants as those in which the men of O'Leary's organization were employed, and also in the actual construction of buildings.

The operation of this system, persistently employed in the metropolitan district, has excluded the plaintiff's product from the New York market. In November, 1923, the men employed in the plaintiff's plant were all members of local unions in New Haven, Conn., in so far as there were any unions to which these men could belong. The plaintiff had secured a contract to furnish the cast stone required in the construction of an apartment building at 108 East Eighty-Sixth street, New York City. The general contractor had also placed a contract for natural stone with another subcontractor. This subcontractor in November informed the general contractor that he could not obtain the services of any stone cutters to prepare the natural stone, because the cast stone was declared to be nonunion. O'Leary thereafter filed a grievance against this job, and in company with Cronin called on the general contractor, insisting that the cast stone was "unfair" and nonunion made. A strike was called, and the matter was only adjusted after the general contractor had agreed with the unions not to use the plaintiff's stone on other buildings.

During this difficulty the manager of the plaintiff's plant appealed to the president of the local journeymen stone cutters' union in New Haven, who was employed in the plant, and whose union had no grievance whatsoever regarding the conditions or terms of employment there. This man communicated with Mitchell, the president of the Journeymen Stone Cutters' Association of North America, in Indianapolis, who shortly thereafter came on to New York, conferred with Cronin and the members of the New York local union in New York City, and then went to New Haven to inspect the plaintiff's plant and the plant of another artificial stone company in New Haven, which was also unionized in so far as there were local unions in which its employees could be members.

There is considerable conflict in the testimony regarding conversations which occurred at the two plants, and some uncertainty as to the occurrences at a meeting of the local Union, which was addressed by Mitchell and Cronin. The net result, however, is clear. The men in both plants were told that they must not work on stone intended for the New York market, and they thereafter refused to work on such stone and demanded an increased wage. The manufacturers were told that the only solution was to satisfy O'Leary by unionizing other classes of labor in their plants than those for which unions already existed in New Haven. I am satisfied that O'Leary would not have been so easily satisfied. Cronin, who had been most intimately associated with O'Leary in all of his activities in the metropolitan district in excluding the plaintiff's stone from that market, testified that his understanding when he left New Haven was that the plant was to be completely unionized, and that then everything would be satisfactory to O'Leary, and there would be no further grievances filed. But it appears from O'Leary's testimony that, when Cronin came back from New Haven, he said nothing of the kind to him. I cannot believe that, if the purpose which these men had in mind during their intimate and active association in all that they did to exclude the plaintiff's stone from the New York market was inspired by a desire to organize the workers in the plaintiff's plant, no word would have been passed between them after the New Haven visit that this purpose was about to be accomplished.

The only rational inference that I can draw is that their sole and guiding purpose was to exclude the competition from the New York market, which they feared would affect the economic condition of the plants in which their men were employed. This being true, what happened as a result of their visit to New Haven is to be regarded as incidental to and inspired by the purpose with which their activities were conducted in New York, and not by any honest effort to improve the conditions and terms of employment existing in New Haven, Conn., or to organize the men there employed in the two competing plants, who had not theretofore been organized because there were no unions in which they could become members.

The defendants' counsel, in his argument at the close of the proofs, quite frankly treated the case as one in which his clients were serving the economic interests of their members in excluding from the New York market competition of outside firms, which threatened to reduce the profits of employers and the wages of employees in this city. Whatever may be said to justify what was done upon grounds of social justice or economic welfare is not open to consideration in this court. Decision is controlled by Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16

A. L. R. 196. This is not a case in which the restraint of or interference with interstate trade and commerce can be said to be the incidental and indirect result of a controversy purely local in character and not intended to restrain interstate trade. · On the contrary, the primary purpose and the direct result of what was done in New York was to exclude the plaintiff's product and the product of other manufacturers moving in interstate commerce from entering the New York market in competition with New York firms. And there was no local controversy in New Haven, of which this was the indirect result.

It is a matter of no consequence that the purpose was also to shut out stone manufactured within the state of New York, as well as that made ouside the state. United States v. Brims, 47 S. Ct. 169, 71 L. Ed. ——, cited by the Supreme Court of the United States, November 23, 1926, No. 212, October term, 1926. Whatever was done in New Haven was incidental to the primary purpose of exclusion from the channels of trade. The defendants conspired and contrived to prevent the use of plaintiff's product in building operations within the city of New York, and in furtherance of this purpose, to refuse to handle it or to work on any building in which its use was employed, and to procure all other workmen employed in the building trades to do likewise, and in accomplishment of this purpose, to order the men in the plaintiff's plant to refuse to work on any stone intended for the New York market. I am satisfied that the demand for increased wages was inspired merely as part and as incidental to this general conspiracy and combination, monopolistic in character and clearly in restraint of trade.

The result is that the plaintiff is entitled to injunctive relief. A decree in its favor may be settled accordingly, and upon the settlement of the decree counsel will be heard on the question as to whether there should be a reference to determine damages claimed to be recoverable by the plaintiff.

NOTE.—Upon settlement of the decree, counsel for the plaintiff requested assessment of actual damages, either by the court or by reference to a special master, and in this connection offered to waive treble damages. This request was denied by the court, whereupon counsel for the plaintiff requested that a jury be impaneled to determine the damages suffered by the plaintiff, that the verdict be reported to the court, and that the court treble the damages. This request was also denied.