Common Pleas Court of Cuyahoga County.

STATE EX REL V. ELECTRICAL BUSINESS ASSOCIATION ET AL.

Decided February 11, 1931.

JOHN P. DEMPSEY, J.

In dealing with questions involving business relationships modern courts of equity recognize two fundamental principles as sound and logical:

First: The right to conduct a legitimate business without unfair competition; and,

Second: A denial of the right to restrain trade unreasonably to the prejudice of the public.

It is a recognized economic principal that "cut-throat" competition while entailing a temporary advantage to the consuming public is eventually harmful in that it

usually results in the survival of the fittest, and leaves the public at the mercy of the survivor, a monoply having been effected. It is in recognition of this principal that market prices for standard articles are generally recognized as fair and reasonable, and, in many cases, essential to the best interests of the public. It follows, therefore, that reasonable regulations of a particular industry which do not tend to destroy or stifle competition are economically sound. By a parity of reasoning, unreasonable agreements and regulations having such a tendency are frowned upon and are illegal. The gravamen of the complaint in this case is directed towards an alleged conspiracy among the defendants in restraint of trade. The following are leading authorities on the questions involved:

*List* v. *Co-operative Ass'n.,* 114 O. S., 361:

"Contracts in restraint of trade are not illegal except when unreasonable in character. When such contracts are incident and ancillary to some lawful business and are not unreasonabe in their scope and operation they are not illegal."

*Duplex Printing Press Company* v. *Deering et al. etc.* 254 U. S., 443:

"A conspiracy is a combination of two or more by concerted action to accomplish an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means. If the purpose be unlawful, it may not be carried out by means otherwise lawful; and although it be lawful, it may not be carried out by means that are unlawful."

*Brescia Construction Company* v. *Stone Mason's Contractors' Association et al,* 77 N. Y. Sup., 77:

"An agreement obligating members of a stone masons' union to work only for members of a stone masons' contractors' association, and not to work for any contractor or builder owing money to any member of the association, is illegal and against public policy, as tending to compel contractors to join the association by intimidation, threats, and coercive measures, and as to the clause contemplating that the labor union would assist in collecting by arbitrary and oppressive measures

claimed debts due any member of the association, the contract is illegal and against public policy, because, instead of according alleged debtors the right to have their disputes determined by the established legal tribunals, the associations undertake to constitute themselves judges of the facts and the law and the agencies for enforcing their unauthorized decree.

"A contract between labor union and contractors' association that members of the former shall work only for members of the latter who were not indebted to it is unlawful, in that it tends to create a monopoly, being oppressive both to union workmen and to contractors and builders not members of the association."

*Standard Engraving Company, Inc.*, v. *Volz et al.*, 193 N. Y. Sup., 831:

"Attempt by labor unions to interfere with the management of the business of photo-engraving producers, by prescribing a minimum price at which they can sell their product, with threats of strike if sale be made at a lower price, is violative of General Business Law, Section 340, as amended by laws 1921, c. 712 Section 1, and Section 341, declaring illegal a combination whereby competition is the price of a product used in the conduct of a trade, commerce, or manufacture is restrained."

*McCord* v. *Thompson-Starrett Company*, 129 App. Div. Reports, 130, Aff. 198 N. Y., 587:

"While an individual employer may lawfully agree with a labor union to employ its members only, such agreement when participated in by all or a large portion of employers in any community, so as to become oppressive by operating generally upon the craftsmen, in the trade and imposing upon them a penalty for refusing to join the favored union, is against public policy and void."

Applying these fundamental and adjudicated principles to the case at bar, the Court finds that the following doctrine obtains with reference to the issues and the facts:

So long as it operates within the purpose clause of the charter granted to it by the State, the E. B. A. is a legitimate enterprise, and every person, firm or corporation engaged in the electrical industry in this com-

munity has the right to be a member upon an equal basis of stock ownership, the inhibition against Ohio corporations holding stock being removed under the present crporation act.

The principle of collective bargaining by workmen through the instrumentality of union organizations has long been recognized as just and reasonable.

The elimination of strikes and lock-outs with their attendant hardship upon the public through the establishment of friendly relationship between capital and labor upon a sound and reasonable contractual basis is to be encouraged.

Labor cannot be used by capital as a means of enforcing agreements and regulations among members of an industry to establish fixed prices for their commodities or strifle competition in bidding or to coerce others into joining an association of such members.

Members of the E. B. A. have the right to meet and discuss the ramifications of their industry, exchange ideas with a view to greater efficiency and service to the public; and to agree as to what constitutes reasonable prices for their commodities to the extent that such commodities are standard. But they do not have the right to stifle or restrict free competition in bidding upon construction or installation work by the allotment of contracts, by disclipining low bidders, or by any other method having a tendency to deprive the public of the benefit of free competition. The union has a right reasonably to promote the best interests of its members with reference to reasonable working conditions and reasonable compensation, but it does not have the right to combine with capital for the purpose of enforcing fixed prices or insuring certain profits or coercing non-members to join an association of employers. The public has the right to choose with whom it will contract without coercive interference on the part of any association of capital or labor or both.

The case at bar does not involve a quarrel between capital and labor, the gist of the complaint being that their friendly relationship has exceeded reasonable limi-

tations. The burden rests upon the plaintiff to establish the facts requiring the exercise of the equitable powers of the court by clear and convincing proof.

The Court is limited to a consideration of the competent, relevant and material evidence introduced during the trial, and cannot be governed by hear-say, suspicion or rumor.

Electricity is still in its infancy despite the rapid strides it has made in the present generation. The evidence in this case, on the issues, involves almost exclusively conditions in the house-wiring branch of the industry, including apartment houses.

This branch of the industry has had a more or less mushroom growth in this community, with attendant sacrifice of efficiency on the part of many contractors engaged in it. The principle difficulty which has resulted in the bringing of this action, as the Court views it, comes from the fact that a number of men after serving a certain period as apprentices and journeymen, conceived the idea that they were fitted to became business men and graduate from the ranks of employees to those of employers, when as a matter of fact they were unfitted by lack of education and business training to be successful contractors in a competitive field. The Court has been impressed with the fact in this case that several of the union men called as witnesses displayed more intelligence and erudition and greater familiarity with the ramifications of this industry than some of the contractors who testified. The president of the Union is a college graduate, and he and other members who testified demonstrated clearly that they are students of the subjects involved. Their evidence was free from the halting and evasive manner and the contradictions that characterized some of the other testimony.

Wiring is a technical art with which the average owner is unfamiliar. Much of the work is concealed and the danger of personal injury and the hazard of fire are great unless skill, care and honesty are employed. An unscrupulous contractor who has engaged in "cut-throat" competition in order to procure a contract, and

desires to save his profit by inferior work and the use of inferior material, may deceive an unsuspecting owner if the work technically complies with the building code or is not detected by city inspection, unless a scrupulous electrician, taking pride in his work, exercises his right to complain and to report the matter. The evidence shows instances of this sort.

A large percentage of this work of wiring apartment houses and residences in greater Cleveland under contracts for $10,000 and less is done by persons, firms or corporations who are members of the E. B. A. or were during the period covered by the petition, the estimates varing under the evidence from 33-1/3% to 75%. This group is known as the "apartment house" group. About seven years ago they began to organize among themselves for the purpose of exchanging ideas and improving chaotic conditions in their branch of the industry. Meetings were held in Virginia Hall and other places in the vicinity of St. Clair Avenue and East 105th Street. About the time the E. B. A. was organized in 1925, their meetings were being held in Baumoel's Restaurant on Euclid avenue. Gentlemen's agreements were entered into to refrain from infringing upon each other's customers, and though the evidence is somewhat conflicting on the subject of prices, the weight of the evidence disclosed that prices were at least discussed, if not actually agreed upon. They were unable to accomplish very much, principally for the reason that they were unable to agree upon a proper construction of their conduct in bidding. Some of the group joined the E. B. A. and induced others to join, with the hope that their objects could be better accomplished through the medium of the larger organization. As expressed by one of the witnesses, they conceived the idea that by making "Fitz", as Mr. Fitzgerald, the Secretary and Business Manager of the Union, is popularly known, "policeman" they would be able to enforce their policies. A meeting was held in Mr. Fitzgerald's office the latter part of 1928, which was attended by this group and by Mr. Fitzgerald and Mr. Kubach, the Secretary and

Business Manager of the E. B. A. The evidence is quite conflicting as to the details of this meeting, but it does disclose the fact that out of it came a list of prices called the "printed sheet" and an arrangement for this group to meet regularly on Saturday mornings at E. B. A. headquarters. These Saturday morning meetings were held religiously, some of them being attended by Mr. Fitzgerald and most of them by Mr. Kubach, and an agreement was entered into by this group to stifle competition, not only by agreeing to maintain the prices set up but to allot contracts, a quota being agreed upon for each member.

As heretofore pointed out by the Court there is nothing illegal about the establishment of prices for standard commodities, provided such prices are reasonable from the standpoint of the public, but there are too many uncertainties with reference to cost to permit the work of installation and construction involved in the specifications bid upon to become the subject of fixed prices, except to the extent that such a schedule is used for educational purposes and as a guide, and is not binding upon the members. Furthermore, the agreement to allot contracts and establish quotas was in direct violation of law, and was intended to destroy competition among the group. That this scheme was carried into execution to a limited extent at least is manifest from the evidence, but it never became generally effective, for the reason, as shown by the testimony of several witnesses, that the conspirators "cheated", and after awhile a large part of the time at the Saturday morning meeting was consumed by the members complaining of violations of the agreement and referring to each other as "cheaters", "cut-throats," etc. A grand jury investigation put an end to their meetings.

It is claimed on behalf of the plaintiff that Mr. Fitzgerald and his assistants endeavored to assist in the promotion of this scheme by coercive measures against price cutters. There is no evidence that the Union, as an organization, ever authorized or ratified any acts of Mr. Fitzgerald in connection with his at-

tendance at meetings and otherwise dealing with this group. There is some evidence of intimidation in certain cases, which has been denied, and some evidence of "pulling" men when money was owing a contractor. The contract between the E. B. A. and the Union defined the rights and obligations of the parties. The same form of contract was used for furnishing men for other employers. The provisions of this contract are reasonable and when business men voluntarily enter into such a contract they should live up to it. While it would seem that in one or two instances, the business agents were unduly active in "pulling" men, as in the case of Herman when his men were "pulled" but those of Mintz and Roboy were not disturbed, however, in most instances, the evidence shows that the contract was violated by the employer by a secret partnership with a journeyman, as in the case of Newell, or by such violation as failure to pay workmen, or paying them with worthless checks, failure to provide industrial compensation insurance under the Ohio Law, failure to provide an operator during installation of wiring for sound pictures (the evidence showing that this precaution is necessary and proper), the doing of journeymen's work by a contractor, etc. In the case of one complaining witness, the evidence showed that he received his apprenticeship and journeyman training as a union member, left the union to take up other employment, and then later engaged in the work of installing fixtures, posing as a union member when in fact he was not. The evidence also shows that his credit was bad, which probably accounts for his difficulty in buying material, except for cash. The evidence also shows this credit condition to exist with reference to other contractors who complained about inability to purchase material, two of whom, at least, went through bankruptcy and still owe the material concerns. Considerable stress was laid upon Mr. Herman's evidence to the effect that he was fined $1,000.00 "for being a bad boy," which he claims was later reduced to $250.00. His statement with reference to this fine was emphatically denied by

several credible witnesses. His testimony in several respects was in conflict with his testimony under oath when his deposition was taken, and he contradicted some of his testimony in this case on cross-examination on behalf of the defendants. While he probably paid something to somebody in making his peace, the preponderance of the evidence shows that such payment was not assessed, authorized or ratified by the directors of the E. B. A. At this point it should be noted that the general scheme to stifle competition was participated in by at least two directors, a vice-president and the Secretary of the E. B. A. Testimony was also given with reference to payments of small amounts of money, ranging from $25.00 to $50.00 to or for Mr. Fitzgerald. This testimony was contradicted by Mr. Fitzgerald and Mr. Kubach, and the latter's testimony on this subject was corroborated in part. In any event if these payments were made they were made voluntarily, and amounted to nothing more than a gratuity in each instance.

The evidence in this case on the complaints of the petition with reference to a restraint of trade is limited to the house and apartment house wiring done by this group of members of the E. B. A., aided and abetted by the paternalistic efforts of Mr. Kubach and Mr. Fitzgerald. In view of the fact that this group performs such a substantial percentage of this work in this community, reasonable regulations in accordance with the finding and conclusions of this opinion will be incorporated in the decree.

This is not a criminal action nor an action at law for damages, equitable relief being the only relief sought.

The decree will provide for the dismissal of the action as to those defendants with reference to whom no evidence of complicity was introduced.