**BALTIMORE MAIL S. S. CO. v. UNITED STATES.**

No. 4910.

District Court, D. Maryland.

April 20, 1934.

Stuart S. Janney, Charles Markell, and William A. Grimes, all of Baltimore, Md., for plaintiff.

O. P. M. Brown, Sp. Counsel, Shipping Board, of Washington, D. C., and Cornelius Mundy, Asst. U. S. Atty., of Baltimore, Md., for the United States.

WILLIAM C. COLEMAN, District Judge.

This is a suit to recover alleged excessive interest paid on a government loan for reconstruction of one of the plaintiff company's vessels.

On June 15, 1933, a hearing was had on the demurrer of the government to the declaration filed in this case. As a result of this hearing, this court overruled the demurrer for the reasons set forth in the court's oral opinion, and only two questions were left for decision on the merits: (1) Whether the protest of the plaintiff company, which was made at the time that it paid the interest demanded of it by the government at the rate of 3 per cent. per annum, and which it claimed to be excessive and illegal, was sufficient in law to constitute the payment of this interest an involuntary payment, so as to entitle it to recover such part of this interest as might be determined to have been unlawfully exacted;

and (2) what is the maximum rate of interest which the government was entitled to exact from the plaintiff company on the loan in question, pursuant to the terms of section 11 (d) of the Merchant Marine Act of 1920, as amended by the Merchant Marine Act of 1928 (45 Stat. 690, c. 675); this court having found, as set forth in its oral opinion rendered when the demurrer was overruled, that this statute, and not the provisions of the contract pursuant to which the loan was made, or the amendment of 1931 to the Merchant Marine Act (46 USCA § 870), controls. As a result of the demurrer being overruled, the government, in due course, filed general issue pleas to the declaration; issue was joined, and evidence taken and arguments heard on November 13 and 14, 1933, bearing upon the two questions above named.

Taking up the first of these questions, we find that the evidence fully substantiates the allegations of the declaration that payment of 3 per cent. interest was made "not voluntarily, but by compulsion of necessity to prevent an immediate seizure of the vessel without legal process (under color of provision in the preferred mortgage to the same effect as provision in the loan agreement for such seizure for default in payment of interest), and was expressly made under protest and without prejudice" to the right of the steamship company to have refunded to it the amount found to be excessive.

Both the preferred mortgage and the loan agreement expressly empowered the government, in case of any event of default in the payment of any part of any interest, to take the vessel without legal process, wherever it might be, and hold, lay up, lease, charter, operate, or otherwise use or sell it. Mortgage, article II, section 1, paragraphs (3) and (4); Loan Agreement, sections 28 and 29.

The correspondence between the steamship company and the government as evidenced by a series of letters which were transmitted in June, 1931, discloses very definitely that the rate of interest provided in the contract was protested against, and was paid only because to have withheld payment would have been confiscatory of the steamship company's property and business at that time. For example, in the steamship company's letter of June 13th to the United States Shipping Board, we find the following:

"Such rate was placed in the agreement over the protest of this company, which was, however, obliged to sign the agreement and, subject to said protest, accept the terms fixed by you, as the company had already purchased the ships, incurred heavy obligations with respect to the reconstruction thereof and with respect to the mail contract with the Postmaster General.

"This company now again protests the rate of interest fixed in said agreement as illegal and contrary to the express terms of the Act of Congress above quoted, and your attention is respectfully called to the fact that the Attorney General of the United States has definitely ruled that your Board had no power at that time to fix by agreement or otherwise a rate of interest to be carried by such loans differing in any respect from the rate fixed by the aforesaid section 11 (d) as amended by the Merchant Marine Act of 1928, thus putting beyond question the validity of this protest.

"It is thus clear that the rate purported to be fixed in the agreement of September 11, 1930, is illegal and that this company is entitled to the rate prescribed by Section 11 (d) of the above Merchant Marine Act of 1928.

"We are accordingly writing to request you to secure from the Secretary of the Treasury on your request a certificate showing the lowest rate of yield on Government obligations as defined in said Section 11 (d), so that the legal interest rate to be borne by this loan, contracted for in the aforesaid agreement, may be inserted in the notes."

Again, on June 15th, the steamship company wrote to the Shipping Board as follows: "We now again protest the illegal rate exacted by you in violation of said Act of Congress and respectfully state that this company is signing the notes for the same under protest and specifically reserves all its rights with respect to the validity of said rate and of the notes given in evidence thereof."

It is true that thereafter, on June 19th, as a result of the Shipping Board advising the steamship company that no money under the loan agreement could be obtained by it unless its protest against the rate of interest was withdrawn, the steamship company did authorize the return of the aforementioned letters of June 13th and June 15th. Such return was made and advances under the loan began. But under date of December 14th, in making remittance, the steamship company wrote as follows: "The Baltimore Mail Steamship Company makes the application for foreign trade interest rate and the payment enclosed herewith under protest and without prejudice to its contention that the rate of interest to be paid while the vessel is operated in foreign trade is one-half of 1%, which was the lowest rate of yield (to the

nearest ⅛ of one per centum) of any Government obligation bearing a date of issue subsequent to April 6, 1917 (except postal savings bonds) and outstanding on June 15, 1931, when the loan was made by the Board to this Company."

At the same time the company forwarded an affidavit on form prescribed by the construction loan committee of the United States Shipping Board for the operation of the steamship City of Baltimore in foreign trade. While this affidavit, taken independently, may appear to be a waiver of any further protest against the requirement for 3 per cent. interest, nevertheless, if read in connection with the letter with which it was transmitted, as it must be read, we construe it otherwise.

Such circumstances clearly connote an involuntary payment. Swift & Courtney & Beecher Co. v. United States, 111 U. S. 22, 4 S. Ct. 244, 28 L. Ed. 341; Chesebrough v. United States, 192 U. S. 253, 24 S. Ct. 262, 48 L. Ed. 232; United States v. New York & Cuba Mail S. S. Co., 200 U. S. 488, 26 S. Ct. 327, 50 L. Ed. 569; Atchison, etc., Ry. Co. v. O'Connor, 223 U. S. 280, 32 S. Ct. 216, 56 L. Ed. 436, Ann. Cas. 1913C, 1050; Gaar, Scott & Co. v. Shannon, 223 U. S. 468, 32 S. Ct. 236, 56 L. Ed. 510.

Taking up the second question, the applicable provision of section 11 (d) as amended by the Merchant Marine Act of May 22, 1928 (45 Stat. 690, c. 675), reads as follows: "All such loans shall bear interest at rates as follows, payable not less frequently than annually: * * * During any period in which the vessel is operated in foreign trade the rate shall be the lowest rate of yield (to the nearest one-eighth of 1 per centum) of any Government obligation bearing a date of issue subsequent to April 6, 1917 (except postal-savings bonds), and outstanding at the time the loan is made by the board, as certified by the Secretary of the Treasury to the board upon its request. The board may prescribe rules for determining the amount of interest payable under the provisions of this paragraph." In order to determine the correct rate of interest made applicable by this statutory provision, it is necessary to determine, first, the exact date when the loan was "made by the Board," and, second, what is meant by "the lowest rate of yield" as that phrase is embodied in the statute.

▮ As to the first point, it seems entirely clear that the loan was made on June 15, 1931, because that is the date of the notes representing the loan, and the date when the

mortgage securing the loan was executed, as well as the date when the steamship City of Baltimore, having been completed, was redelivered by the builders to the company pursuant to the reconstruction contract. We are unwilling to accept the government's contention that the controlling date is September 11, 1930, that is, the date when the loan agreement was executed, although, as decided by this court in its previous opinion rendered on the demurrer,[1] this earlier date is controlling with respect to the question as to when the agreement between the parties became effective for the purpose of determining another and different question, namely, whether the provisions of the contract itself are binding, or whether they are supplanted by the provisions of the Merchant Marine Act. The contract has no express provision as to precisely when the loan shall become effective, but provides "all of said notes shall be dated the date of the preferred mortgage securing their payment."

▮ The second point is the one around which revolves greater controversy; the steamship company contending that it is entitled to the benefit of the lowest rate of yield on June 15, 1931, on any type of government obligation bearing a date of issue subsequent to April 6, 1917, except postal savings bonds, which would include treasury certificates of indebtedness and treasury bills, the latter noninterest bearing, both of which have a maturity of one year or less at the time of issue. On the other hand, the government contends that the language of the statute means to include, for purposes of arriving at a prescribed rate of yield, only long-term obligations, outstanding on June 15, 1931, bearing a date of issue subsequent to April 6, 1917, and a coupon rate of interest in excess of 2½ per cent., arguing that any other construction would be absurd because, first, it would render senseless the exception in the statute with respect to postal savings bonds which carry a rate of interest of 2½ per cent.; and, second, because it is not to be presumed, without a very clear intention expressed by Congress, that Congress would lend money for long periods at a rate of return so much less than the government itself is required to pay when it borrows for long periods.

On June 15, 1931, that is, the date when the loan was made and therefore the determining date under the statute, there were three different kinds of government obligations outstanding. First, treasury bonds,

---

[1] Orally.

having a maturity in excess of five years from date of issue; second, treasury notes, having a maturity of from one to five years from date of issue, and third, treasury certificates of indebtedness and treasury bills, having a maturity of one year or less from date of issue. All of these obligations are interest bearing except treasury bills; that is, they carry coupons specifying a given rate of interest. Treasury bills, on the other hand, are noninterest-bearing obligations, sold on a discount basis, the treasury asking for bids on the various amounts of these bills to be sold at a discount and accepting the lowest bids; that is to say, they are sold at a flat price and are payable at a fixed amount without interest, the discount representing the lender's income. The issuance of these bills was not authorized by Congress until June 17, 1929 (chapter 26, 46 Stat. 19, 31 USCA § 754), that is, subsequent to the passage of the Merchant Marine Act of 1928 with which we are here concerned. The government argues that this fact alone is sufficient to refute the steamship company's contention that Congress, in passing the Merchant Marine Act of 1928, could have intended that noninterest-bearing, short-term obligations, none of which were outstanding at the time the act was passed, should be included for the purpose of fixing the interest rate on long-term loans.

If the contention of the steamship company be adopted, it would be entitled to invoke a rate as low as one-half of 1 per cent., because that was the yield to the nearest one-eighth of 1 per cent. to a purchaser on June 15, 1931, of certificates of indebtedness, series TS, issued on September 15, 1930, and having a maturity one year later, although the coupon rate on these certificates was 2⅜ per cent.; and, also, the same rate of yield existed with respect to treasury notes, series C, issued January 16, 1923, and maturing December 15, 1932, but which were called June 8, 1931, for redemption December 15, 1931. These had a coupon rate of 3½ per cent. If the noninterest-bearing, short-term treasury bills be also included, we find that two of these issues, that is, series issued April 2, 1931, and April 3d, 1931, and maturing July 1, 1931, and July 2, 1931, respectively, had a yield to the purchaser on June 15, 1931, as low as three-fourths of 1 per cent. On the other hand, if the government's theory be adopted, namely, that the excepting of postal savings bonds from the act can have no other purpose than to require that the rate shall be greater than the 2½ per cent. rate of postal savings bonds, we find that the lowest interest or coupon rate next highest to 2½ per cent.,

taken to the nearest one-eighth of 1 per cent., on any of the three classes of obligations was 3⅛ per cent., which was carried by treasury bonds issued June 15, 1931, with a maturity date of June 15, 1949, but redeemable on or after June 15, 1946.

To the extent of saying that the excepting of postal savings bonds from the act should be interpreted as having no other purpose than to require that the rate of interest shall be greater than that of postal savings bonds, we believe that the government's contention is correct. To place any other construction upon the statute would clearly nullify the exception. That exception we must assume was inserted for a definite purpose, and the only purpose must have been to set a low level of yield above which the yield on loans must be kept. Also, the provision that only obligations issued subsequent to April 6, 1917, could be considered, confirms this interpretation, because presumably, prior to that date, there were some long-term obligations with yields as low as, if not lower than, that of postal savings bonds, although the testimony in the present case does not disclose what such obligations were. We are not impressed with the argument that the reason for excluding obligations issued prior to April 6, 1917, as well as postal savings bonds, was that the excluded obligations, at least most of them, had special circulation or deposit privileges, and that consequently the rate of yield of such obligations did not represent the price of money as such, but the price of money coupled with these special circulation or deposit privileges. The part of the statute with which we are here concerned was obviously dealing only with the fixing of a minimum rate, of which the borrower might obtain the benefit.

But it does not necessarily follow that the rest of the government's contention is correct, namely, that the word "yield," as used in the statute, must be construed as synonymous with interest or coupon rate. This word has a well-established meaning in the investment world. It is generally understood to mean the proportionate rate which the income upon an investment bears to the total cost, interest excepted, on that investment, taking into consideration the time when the investment may be outstanding before being paid off. Stocks, as a rule, have no definite date of maturity. Therefore, they are usually figured as perpetual; but bonds and most other classes of investments have a fixed time to run. Therefore, the problem of determining the yield is somewhat more complicated with respect to bonds, and special tables are in use to which investors usually turn to ascertain what the

net return of yield is upon bonds. Thus for example, on a bond bearing 5 per cent. interest, having exactly ten years to run before maturity, if it is sold at 108.18, that is to say, $1,081.80 for each $1,000 bond, the net yield to the investor would be 4 per cent. per annum, which is 4 per cent. for each of the ten years and is 4 per cent. upon the entire sum, $1,081.80, invested. See Lagerquist's Investment Analysis 1921, page 152 et seq.; Rollins' Municipal & Corporation Bonds 1919, pages 118 to 120.

In addition to this customary, but at the same time rather technical use of the word "yield," and to the definition which the government would have us apply, there is still a third, or layman's interpretation; namely, that as used in the statute the word "yield" must be taken to mean the net return to the original subscriber, that is to say, the cost to the government of securing the money by issuing the securities. Except in cases where a given security is issued at a premium or a discount, that is, above or below par, this net return will, of course, be the coupon rate. It is this third, or what may be called intermediate, definition of the word "yield" as used in the statute which we think must be applied, for the following reasons: First, as has already been pointed out, it seems clear that it was the intent of the statute to put the return on these government loans, made through the Shipping Board, on a virtual parity with the cost to the government of borrowing money under substantially similar conditions as to duration of the loan obligation; that is to say, as will be hereinafter emphasized, to offer an opportunity for substantial aid to American shipping without cost to the public treasury. This being true, it follows that the intent of the statute must have been to obviate daily market fluctuations in government securities, and to adopt as the criterion the cost to the government at the date of issue of any given security. Second, if interest or coupon rate as opposed to "yield" were intended, the proviso in the statute that the rate shall be the lowest rate of yield to the nearest one-eighth of 1 per centum of any government obligation as specified would appear to be useless because, as disclosed by the analytical tables of securities placed in evidence, there was no security bearing a coupon rate expressed in fractions of less than one-eighth; whereas, government obligations have been issued at a premium. For example, the tables in evidence disclose that treasury bonds issued June 15, 1927, bearing coupon rate of 3⅜ per cent., were issued at 100½, which represented a return to the original subscriber of 3.316 per cent.

It thus appears that we must reject the definition of the word "yield," as used in the statute, contended for by the government, and also the definition contended for by the steamship company, because, by adopting this third and different definition, we more completely carry out the apparent intention of Congress as embodied in the statute. It is true that for the purposes of the present case we arrive at the same result as though the government's theory of the flat interest or coupon rate were adopted, because, as already shown, the yield nearest above the 2½ per cent. rate of postal savings bonds was 3⅛ per cent., namely, yield upon 3⅛ per cent. treasury bonds issued at par June 15, 1931, maturing June 15, 1949, and redeemable on or after June 15, 1946. The result is that we thus find that the rate of 3 per cent. exacted by the government in the present case was not only not in excess of the amount authorized by the statute, but was one-eighth of 1 per cent. less than what might have been exacted. However, the present suit is not one brought by the government because of any alleged underpayment, but it is a suit by the steamship company because of alleged overpayment, and there is no counterclaim advanced by the government. Therefore, we are not in the present suit concerned with what might be the right of the government upon a different state of facts and pleadings to assert a claim for more than has actually been claimed.

While with respect to the loan here under consideration no request was made by the Shipping Board of the Secretary of the Treasury to certify the rate of yield, and while the Board has not, as the statute also authorized, prescribed rules for determining the amount of interest payable under the statute's provision, we are urged by the steamship company that the custom which has prevailed in both the Shipping Board and the Treasury Department should control. With respect to this custom, the testimony discloses that for nine years prior to the passage of the Merchant Marine Act of 1928, and subsequent thereto, it has been the uniform practice of the Treasury Department, as well as of the Shipping Board, to ignore the aforegoing limitations and for the Treasury Department, whenever requested by the Shipping Board, to certify the lowest rate of yield on any outstanding obligation of any sort, including treasury certificates, and also including, since 1929, treasury bills, thereby totally disregarding the rate of postal savings bonds.

The Commissioner of Accounts and Deposits of the Treasury Department testified that whereas he had not been called upon, in connection with this particular loan, to make a certification, nevertheless he had constantly made similar certifications at the request of the Shipping Board, and testified that on June 15, 1931, the lowest rate of yield was one-half of 1 per cent., if calculated in the manner he had always been accustomed to calculate the yield on previous occasions for the Shipping Board, namely, on the basis of daily reports, received in the Treasury Department from the Federal Reserve Bank of New York, of current bid and ask prices for all of the various types of government obligations traded in on the New York market. It further appears that this method of computation, while the result of instructions issued in the Treasury Department, was never formally passed upon by the Solicitor of that Department, or by the Attorney General.

We are not unmindful of the fact that when words have received an established construction by administrative officials, such will not be disturbed except for weighty reasons. See Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457; U. S. v. Jackson, 280 U. S. 183, 50 S. Ct. 143, 74 L. Ed. 361. However, this rule of general application must fall in the face of a situation which does not permit of its application without destroying the common-sense meaning of the particular language. If a statute is capable of two or more interpretations, that one must be given to it which is the more reasonable, and the object sought to be reached by any given piece of legislation may very well limit and control the literal import of the words or phrases actually employed. Holy Trinity Church v. U. S., 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; Sorrells v. U. S., 287 U. S. 435, 53 S. Ct. 210, 77 L. Ed. 413, 86 A. L. R. 249.

While what Congress may have enacted previously or subsequently is not a criterion, nevertheless, it is highly persuasive of the construction here adopted that this same section of the Merchant Marine Act, prior to the amendment of 1928 with which we are now concerned, provided that for any interest period during which a vessel was operated in foreign trade, the rate should not be less than 4¼ per cent. per annum. See Act June 5, 1920, c. 250, § 11, 41 Stat. 993; Act June 6, 1924, c. 273, § 1, 43 Stat. 467 (46 USCA § 870). The latest amendment of February 2, 1931, fixes such rate at not less than 3½ per cent. per annum. See chapter 100, 46 Stat. 1059 (46 USCA § 870).

Any doubt that the framers of the interest rate clause intended to have excluded from interest rate calculations all rates as low as 2½ per cent., and also to make applicable the next highest yield to the original subscriber, on other obligations issued since April 6, 1917, and still outstanding at the time the loan is made, is further dispelled by the legislative history of this clause, when read in the light of the explanatory statements of members of Congress, who were in charge of the Merchant Marine Bill when it was being discussed in the Senate and in the House. It is well settled that committee reports and explanatory statements of such members made in presenting a bill for passage are legitimate aids to the interpretation of a statute if its language is doubtful or obscure; such being admissible only to resolve the doubt, and not to create it. Railroad Commission of Wisconsin v. C. B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

On December 6, 1927, Senate Bill No. 744, commonly known as the Jones-White Bill, was introduced in the Senate by Mr. Jones, of Washington. Neither loans nor interest were mentioned in the bill. It was then referred to the appropriate Senate committee and reported out January 9, 1928 (Senate Report 39). This report made no reference to loans or interest. On January 27, 1928, the bill was passed by the Senate, still containing no reference to loans or interest rates. (69 Congressional Record, page 2251).

In the House, Senate Bill No. 744 was referred to the committee on Merchant Marine and Fisheries on February 1, 1928, and reported out April 17, 1928. (House Report No. 1279). Title 3, section 301 (d), as reported out, read in part as follows: "During any period in which the vessel is operated in foreign trade the rate shall be the lowest rate of yield (to the nearest one-eighth of 1 per centum) of any Government obligation * * * outstanding at the time the loan is made by the board. * * *" In this report we find this significant passage (page 6): "It is recognized by all who have studied this subject that the increase of this fund [Construction Loan Fund] and its utilization under the direction of the Board to aid in the construction of new ships, and in reconditioning, remodeling and improving of existing vessels, offer an opportunity for substantial aid to American shipping *without cost to the public treasury*." (Italics inserted.) This

gave rise to a discussion on the floor of the House, and the following comment is significant as coming from Mr. White, chairman of the committee on Merchant Marine and Fisheries, made in answer to a question by Mr. Somers of New York as to what "the lowest rate of yield of any government obligation outstanding at the time the loan is made" would currently amount to. Mr. White stated (69 Congressional Record, page 7830): "There are many government securities and I cannot give you the exact figures of what that would be. Some of the earlier loans bear as low a rate of interest as 2%. I may say that I have called a meeting of the Committee tomorrow morning to still further consider that language. It appears there is some doubt in the minds of members as to whether we should authorize as low a rate of interest as that particular section now permits. Before that matter is disposed of in the House, I want to bring to you the more considered judgment of the Committee on Merchant Marine and Fisheries on that point." On May 5th, Mr. White, apparently in conformity with his remarks just quoted, offered an amendment to the bill by authority of the committee on Merchant Marine and Fisheries. This amendment inserted after the word "obligation" in the aforegoing quotation of title 3, section 301 (d) the words "bearing a date of issue subsequent to April 6, 1917 (except postal-savings bonds), and. * + * " This amendment was agreed upon (69 Congressional Record 7896). The Senate refusing to adopt the bill as amended, it was referred to a conference committee, and on May 15, 1928, was reported out of this committee, containing the interest rate clause as the House had amended it. During the ensuing discussion of the conference report in the Senate, Senator Jones (who with Congressman White was a member of the conference committee, and with him had sponsored the bill), participated in the following colloquy (69 Congressional Record 8720):

"Mr. Blaine. Am I correct in the understanding that vessels engaged in foreign trade may obtain loans at a rate of interest as low as $2\frac{1}{2}\%$?

"Mr. Jones. No; I do not understand it is that low. I understand the lowest rate is about $3\frac{1}{4}\%$.

"Mr. Fletcher [also a member of the conference committee]. It is whatever the government rate is.

"Mr. Jones. Yes; it is the government rate."

On May 22, 1928, Senate Bill No. 744 was enacted into law as Public Act No. 463 (45 Stat. 689).

Summarizing our conclusions, therefore, we find that the rate of interest, 3 per cent., which the steamship company paid, under protest, on the loan involved in this proceeding, was not excessive or illegal under Section 11 (d) as amended by the Merchant Marine Act of May 22, 1928 (45 Stat. 690, c. 675); and that therefore the steamship company is not entitled to recover anything in this proceeding, but that judgment must be for the government. Such separate enumeration of the findings of fact and conclusions of law as the court may later find to be necessary in order fully to comply with the procedural requirements of 28 USCA § 764, will be prepared in due course.